**Richard D. NORRIS,
Plaintiff, Appellant,**

v.

**LUMBERMEN'S MUTUAL CASUALTY
COMPANY, Defendant, Appellee.**

No. 89–1019.

United States Court of Appeals,
First Circuit.

Heard May 4, 1989.

Decided Aug. 3, 1989.

Ernest C. Hadley, Wareham, Mass., for plaintiff, appellant.

Kalvin M. Grove with whom Cary Schwimmer and Fox and Grove, Chartered, Chicago, Ill., were on brief, for defendant, appellee.

Before BOWNES and TORRUELLA, Circuit Judges, and RE,* Judge.

BOWNES, Circuit Judge.

Richard D. Norris, plaintiff-appellant, appeals from the district court's dismissal of

---

* The Honorable Edward D. Re, Chief Judge of the United States Court of International Trade, sitting by designation.

his wrongful discharge action based on Massachusetts contract and tort law against defendant-appellee, Lumbermen's Mutual Casualty Company (Lumbermen). The case had been removed by Lumbermen from the state court to federal court. The district court dismissed Norris' suit because the court determined that it was preempted by federal law. *Norris v. Lumbermen's Mut. Casualty Co.*, 687 F.Supp. 699 (D.Mass.1988). For the reasons set forth, we reverse.

## I. FACTS

Lumbermen provides insurance and inspectional services to nuclear power plants. The inspectional services are provided during the construction phase of a nuclear power plant and precede the issuance of an operating license by the Nuclear Regulatory Commission.[1] From 1976 until his discharge in 1987, Norris was employed by Lumbermen in its Kemper Insurance Group as the Northeast Regional Manager of the Special Inspection Services Section. As Regional Manager, Norris' duties included establishing and implementing inspectional services, assuring that all such services were in compliance with applicable standards, soliciting and retaining clients, and providing direct inspection and audit services to Lumbermen's clients. Norris' complaint alleges three incidents where he voiced his concern about matters of safety relating to Lumbermen's inspectional services.

In April 1985, Norris was assigned to investigate a complaint regarding reactor pressure vessels at the Vogle Nuclear Power Station in Georgia. Another Lumbermen inspector had inspected the vessels when they were manufactured. Norris determined that the original inspector had been negligent in his inspection, and Norris reported this to his supervisor, Robert Muise. In mid–1986, Muise requested that, because of pending litigation involving the vessels, Norris have a supervisor delete,

from an employee appraisal report, any reference to the substandard inspection. Norris objected but when Muise insisted, he complied.

In June 1986, Norris investigated a former employee who had worked as an inspection trainee at the Seabrook Nuclear Power Plant. His preliminary investigation discovered several problems which he felt warranted a full investigation. He reported this to Muise. Muise indicated that such an investigation could interefere with the completion of Seabrook's data report certifications, which are distributed, *inter alia*, to the Nuclear Regulatory Commission. Muise told Norris to ignore his preliminary findings and not to investigate the matter further. Norris complied.

In December 1986, Muise revised Lumbermen's inspection instructions and standards in such a way as to eliminate a verification technique which would have identified the defective pressure vessels at Vogle. Norris objected to the revision but took no further action.

In March 1987, Public Service Electric and Gas Company (PSE & G) hired Lumbermen to conduct an audit at its Salem Nuclear Power Plant in New Jersey. Norris informed Muise that he would be conducting the audit on Lumbermen's behalf. Norris conducted the audit in May 1987. Shortly thereafter, Lumbermen's Internal Security Division investigated Norris' activities at PSE & G. It concluded that Norris' activities had been conducted without Lumbermen's consent or knowledge, constituted a conflict of interest and resulted in Norris' personal financial gain. The investigation also found that Norris submitted fraudulent expense vouchers and time sheets from 1985 to 1987. Norris denies the charges with respect to his activities at PSE & G and claims that Lumbermen encouraged him to misrepresent his expenditures.

In June 1987, Lumbermen fired Norris. Lumbermen did not inform Norris of its

---

1. Quality assurance inspections and audits are required by the Nuclear Regulatory Commission (NRC). 10 C.F.R. § 50 App. B (1987); *see also Kansas Gas & Elec. Co. v. Brock,* 780 F.2d 1505, 1507 (10th Cir.1985) (describing the NRC program), *cert. denied,* 478 U.S. 1011, 106 S.Ct. 3311, 92 L.Ed.2d 724 (1986).

investigation or offer him a chance to respond to its allegations. Lumbermen had contacted PSE & G on at least two occasions while Norris was still working for Lumbermen and gave it false and harmful information regarding Norris. Lumbermen did not inform Norris of these communications. After Lumbermen discharged Norris, he applied for a job with PSE & G but it did not hire him.

### Procedural History

In November 1987, Norris filed suit in Massachusetts Superior Court. Norris' complaint contained three counts. Count I alleged that defendant

has intentionally breached the implied covenant of good faith and fair dealing in terminating the employment of Plaintiff in retaliation for the faithful discharge of his employment duties consistent with state and federal laws, such termination violating the dictates of public policy.

Count II alleged that defendant

has intentionally and knowingly disseminated untrue and harmful information regarding Plaintiff and his employment with Defendant thereby interfering with Plaintiff's right to contract with other employers in his chosen professional field.

Count III alleged:

Defendant, by and through the actions of its officers, employees and agents, knowingly, intentionally and tortiously wrongfully terminated the employment of Plaintiff for reasons which contravene public policy; to wit, Defendant has terminated Plaintiff in retaliation for exposing policies, practices and procedures of Defendant which impact upon the safe construction and operation of nuclear power plants, and which violate the regulations of the Nuclear Regulatory Commission, and which expose the public to substantial risk of injury and death from nuclear accidents.

Lumbermen removed the case to federal district court on the basis of diversity. 28 U.S.C. § 1441. It then moved to dismiss all counts. Lumbermen contended that all three counts failed to state claims upon which relief could be granted. Fed.R. Civ.P. 12(b)(6). It also contended that counts I and III should be dismissed pursuant to Fed.R.Civ.P. 12(b)(1), lack of subject matter jurisdiction, because the claims were preempted by 42 U.S.C. § 5851, the "whistle blower" provision of the Energy Reorganization Act.[2]

The district court granted Lumbermen's motion with respect to counts I and III on the basis of preemption; on these counts, it did not reach Lumbermen's alternative argument concerning the failure to state a claim. *Norris*, 687 F.Supp. at 704. The district court denied the motion to dismiss count II. *Id.* Subsequent to the district court's opinion, the parties agreed to dismiss count II with prejudice. Thereafter, Norris appealed the district court's ruling with respect to the preemption of counts I and III by 42 U.S.C. § 5851.

Norris does not allege that he reported Lumbermen's inspectional lapses to the NRC or otherwise took any action specified in § 5851(a): (1) commenced or caused to be commenced a proceeding for the administration or enforcement of any requirement under the Atomic Energy Act of 1954; (2) testified or is about to testify in any such proceeding; or (3) assisted or participated in any such proceeding. Norris made complaints to his supervisor and filed reports with Lumbermen. These are known as "internal" complaints. Lumbermen argues that internal complaints are covered by § 5851.

We need not decide whether internal complaints are covered by § 5851 for two reasons: since we find that Norris may proceed on the basis of his state law claims, whether internal complaints are covered by § 5851 is immaterial; and the statute of limitations has run as to any claim Norris might have had under § 5851.

---

**2.** Section 210 of the Energy Reorganization Act, 42 U.S.C. § 5851, is set forth in its entirety as an appendix to this opinion.

## II. PREEMPTION

Preemption of state law on the basis of federal law derives from the Supremacy Clause of the United States Constitution. Art. VI, cl. 2.[3] Preemption may be express or implied. The Supreme Court has described the various bases for preemption as follows:

It is well established that within constitutional limits Congress may preempt state authority by so stating in express terms. *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 [97 S.Ct. 1305, 1309, 51 L.Ed.2d 604] (1977). Absent explicit preemptive language, Congress' intent to supersede state law altogether may be found from a " 'scheme of federal regulation ... so pervasive as to make reasonable the inference that Congress left no room for the State to supplement it,' because 'the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject,' or because 'the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose.' " *Fidelity Federal Savings & Loan Assn. v. De La Cuesta*, 458 U.S. 141, 153 [102 S.Ct. 3014, 3022, 73 L.Ed.2d 664] (1982), quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 [67 S.Ct. 1146, 1152, 91 L.Ed. 1447] (1947). Even where Congress has not entirely displaced state regulation in a specific area, state law is pre-empted to the extent that it actually conflicts with federal law. Such a conflict arises when "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–143 [83 S.Ct. 1210, 1217–1218, 10 L.Ed.2d 248] (1963), or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 [61 S.Ct. 399, 404, 85 L.Ed. 581] (1941).

*Pacific Gas & Elec. Co. v. State Energy Resources Conservation and Dev. Comm'n*, 461 U.S. 190, 203–04, 103 S.Ct. 1713, 1721–22, 75 L.Ed.2d 752 (1983); *see also Maryland v. Louisiana*, 451 U.S. 725, 746–47, 101 S.Ct. 2114, 2128–29, 68 L.Ed.2d 576 (1981); *Palmer v. Liggett Group, Inc.*, 825 F.2d 620, 624–25 (1st Cir.1987).

■ But regardless of the starting point, "[t]he critical question in any pre-emption analysis is always whether Congress intended that federal regulation supersede state law." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 369, 106 S.Ct. 1890, 1898–99, 90 L.Ed.2d 369 (1986). And in determining congressional intent, it must be kept in mind that "[c]onsideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 U.S. at 746, 101 S.Ct. at 2128.

The first step in determining congressional intent is to examine the statute. Section 5851(b)(1) states that an aggrieved employee *"may ...* file ... a complaint with the Secretary of Labor." (Emphasis added). The section permits but does not mandate the filing of such actions. It does not state that filing with the Secretary of Labor is the employee's *exclusive* remedy.

The legislative history is not particularly helpful. The Senate Report states that § 5851 is based on similar laws which are codified at 29 U.S.C. § 158 (National Labor Management Act); 30 U.S.C. § 815 (Federal Mine Safety Act); 33 U.S.C. § 1367 (Federal Water Pollution Control Act); and 42 U.S.C. § 7622 (Clean Air Act). S.Rep. No. 848, 95th Cong., 2d Sess. 29 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin.News 7303. The Senate Report does not discuss preemption or the exclusivity of the procedure provided by Congress. The parties

---

**3.** Art. VI, cl. 2 states in pertinent part:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

have not cited any explicit statement of congressional intent relative to preemption in the laws on which § 5851 is based or their legislative histories.

It is not surprising, therefore, that the courts which have addressed the issue of preemption vis à vis § 5851 and state law claims are split. Some have found preemption: *English v. General Electric Co.*, 683 F.Supp. 1006 (E.D.N.C.1988), *aff'd per curiam on basis of decision below*, 871 F.2d 22 (4th Cir.1989); *Snow v. Bechtel Constr. Inc.*, 647 F.Supp. 1514 (C.D.Cal.1986); *Chrisman v. Philips Indus., Inc.*, 242 Kan. 772, 751 P.2d 140 (1988). Others have not: *Gaballah v. Pacific Gas & Elec. Co.*, 711 F.Supp. 988 (N.D.Cal.1989); *Stokes v. Bechtel North American Power Corp.*, 614 F.Supp. 732 (N.D.Cal.1985); *Wheeler v. Caterpillar Tractor Co.*, 108 Ill.2d 502, 92 Ill.Dec. 561, 485 N.E.2d 372 (1985), *cert. denied*, 475 U.S. 1122, 106 S.Ct. 1641, 90 L.Ed.2d 187 (1986).

*English* was a wrongful discharge action against General Electric claiming violation of public policy. Plaintiff also claimed intentional infliction of emotional distress. Unlike the case at bar, the plaintiff in *English* reported to the NRC that there were many safety hazards and illegal practices in the place where she worked. In finding preemption, the *English* court first found that Congress did not intend § 5851 "to be a regulator of nuclear safety and therefore preemptive under *Pacific Gas & Electric*." 683 F.Supp. at 1013. The court found that three other aspects of the statute indicated a congressional intent of preemption:

> (1) its applicability only to an employee who has not violated any nuclear requirement, [subsection (g)], (2) the absence of a provision for exemplary damages on behalf of an aggrieved nuclear employee, and (3) the speed with which a charge brought under Section 210 [§ 5851] must be resolved.

683 F.Supp. at 1013.

The court felt that subsection (g) of the statute, which bars an employee from obtaining redress if she has caused a violation of any nuclear safety requirement, was a strong indication of preemption. It reasoned that this bar is not recognized in state law and "the state court would not be required to determine whether or not the aggrieved employee violated some requirement of the Atomic Energy Act or its amendments." 683 F.Supp. at 1014.

*Gaballah v. Pacific Gas & Electric Co.*, 711 F.Supp. 988, 989 (N.D.Cal.1989), which found no preemption, involved a plaintiff who alleged that he was wrongfully discharged by his employer for pointing out "discrepancies between the 'as built' drawings, on which PG & E's seismic safety calculations were based, and the true conditions of the plant." The court discussed the *English* case. *Id.* at 990. It rejected its finding that subsection (g) of the federal statute showed a congressional intent of preemption. *Id.* The *Gaballah* court found "no evidence that Congress intended to do more than bar a federal remedy to employees who themselves violated the AEA [Atomic Energy Act]." *Id.* It also pointed out that subsection (g) would be available in state court cases to employers as a federal law defense. *Id.* The court concluded that § 5851 "can hardly be regarded as pervasive federal regulation of the subject of employer-employee relations in the nuclear power industry." *Id.*

In *Wheeler v. Caterpillar Tractor Co.*, 108 Ill.2d 502, 92 Ill.Dec. 561, 485 N.E.2d 372, the Supreme Court of Illinois delved deeply into the preemption issue. It held:

> The protection of the lives and property of citizens from the hazards of radioactive material is as important and fundamental as protecting them from crimes of violence, and by the enactment of the legislation cited, Congress has effectively declared a clearly mandated public policy to that effect. We hold, therefore, that counts III and VI stated a cause of action for retaliatory discharge for refusing to work under conditions which contravened the clearly mandated public policy, and the circuit court erred in dismissing them.

*Id.* 92 Ill.Dec. at 566, 485 N.E.2d at 377. There was a dissent taking the contrary position.

The Supreme Court has twice examined the scope of preemption in cases involving the nuclear industry. We have already quoted from *Pacific Gas & Elec. Co. v. Energy Resources Comm'n*, 461 U.S. 190, 103 S.Ct. 1713, so we start with that. The issue was whether California laws which conditioned the construction of nuclear plants on findings by a state agency that adequate storage facilities and means of disposal were available for nuclear waste were preempted by the Atomic Energy Act of 1954. *Id.* at 194–95, 103 S.Ct. at 1717–18. The Court held first that

> Congress, in passing the 1954 Act and in subsequently amending it, intended that the Federal Government should regulate the radiological safety aspects involved in the construction and operation of a nuclear plant, but that the States retain their traditional responsibility in the field of regulating electrical utilities for determining questions of need, reliability, cost, and other related state concerns.

*Id.* at 205, 103 S.Ct. at 1722–1723. After an in-depth review of the Atomic Energy Act, its amendments and the legislative history, the Court concluded that

> Congress has preserved the dual regulation of nuclear-powered electricity generation: the Federal Government maintains complete control of the safety and 'nuclear' aspects of energy generation; the States exercise their traditional authority over the need for additional generating capacity, the type of generating facilities to be licensed, land use, ratemaking, and the like.

*Id.* at 211–12, 103 S.Ct. at 1725–26. The Court stated that the "Federal Government has occupied the entire field of nuclear safety concerns, except the limited powers expressly ceded to the states." *Id.* at 212, 103 S.Ct. at 1726. The Court then went on to find that there was a nonsafety rationale for the California law. It accepted California's determination that the disposal of nuclear waste was an economic, not a safety problem and held that "the statute lies outside the occupied field of nuclear safety regulation." *Id.* at 216, 103 S.Ct. at 1728.

For our purposes, the teaching of *Pacific Gas & Electric* is clear. The Federal Government has preempted the field where the matter at issue directly involves nuclear safety concerns.

The other Supreme Court case involving the nuclear energy field is *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984). The issue in *Silkwood* was whether a state-authorized award of punitive damages arising out of the escape of plutonium from a federally licensed nuclear plant was preempted either because it fell within the safety aspects of nuclear energy or because it conflicted with other features of the Atomic Energy Act. *Id.* at 241, 104 S.Ct. at 617. The Court pointed out that, in addition to preemption being found on the basis of congressional intent, "state law is still preempted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law." *Id.* at 248, 104 S.Ct. at 621. In determining whether the punitive damages award conflicted with federal regulation of the safety aspects of nuclear energy production, the Court found ample evidence that Congress had no intention of forbidding the states to provide state-law remedies for those injured by the escape of radiation in a nuclear plant. *Id.* at 250–51, 104 S.Ct. at 622. In fact it found that, "the only congressional discussion concerning the relationship between the Atomic Energy Act and state tort remedies indicates that Congress assumed that such remedies would be available." *Id.* at 251, 104 S.Ct. at 622–23. It reiterated: "Congress assumed that traditional principles of state tort law would apply with full force unless they were expressly supplanted." *Id.* at 255, 104 S.Ct. at 625. In language that is particularly pertinent to the case at bar, the Court stated:

> We do not suggest that there could never be an instance in which the federal law would pre-empt the recovery of damages based on state law. But insofar as damages for radiation injuries are concerned, pre-emption should not be judged on the basis that the Federal Government has so completely occupied the field

of safety that state remedies are foreclosed but on *whether there is an irreconcilable conflict between the federal and state standards or whether the imposition of a state standard in a damages action would frustrate the objectives of the federal law.* We perceive no such conflict or frustration in the circumstances of this case.

*Id.* at 256, 104 S.Ct. at 625 (emphasis added). The Court held that the award of punitive damages was not preempted by federal law. The message for us is contained in the underlined language.

■ For the reasons that follow, we hold that § 5851 has not preempted plaintiff's state law actions for wrongful discharge. First, there is nothing in the words of the statute or its legislative history indicating a congressional intent to bar a whistle blower from bringing a state action for wrongful discharge. As already noted, the language of the statute is permissive not mandatory.

Second, we follow the teaching of *Pacific Gas and Electric* and determine whether § 5851 regulates nuclear safety. We find that § 5851 was not intended to be a regulator of nuclear safety. *See English v. General Elec. Co.,* 683 F.Supp. at 1013. As we read the statute, it is primarily concerned with protecting whistle blowers. It is true that furnishing such protection may result in detecting nuclear safety hazards. But whether or not there is a safety hazard or violation of safety standards would be determined by the Nuclear Regulatory Commission. As the court pointed out in *Silkwood:* " 'Congress' decision to prohibit the States from regulating the safety aspects of nuclear development was premised on its belief that the Commission was more qualified to determine what type of safety standards should be enacted in this complex area." 464 U.S. at 250, 104 S.Ct. at 622. A state law action for wrongful discharge does not affect in any way the safety standards promulgated by the Nuclear Regulatory Commission. The issue in such a case is not the efficacy of nuclear energy safety standards, but whether the plaintiff can prove that he was wrongfully discharged.

We next inquire, in accord with *Silkwood,* whether there is "an irreconcilable conflict" between state law and § 5851 "or whether the imposition of a state standard in a damages action would frustrate the objectives of the federal law." 464 U.S. at 256, 104 S.Ct. at 625. We agree with the district court in *Gaballah,* 711 F.Supp. at 990, that subsection (g), which is not implicated in the case at bar, presents only a speculative conflict not a real one. We also agree that the subsection would be available to a defendant as a federal law defense in state court. *Id.; see also Fidelity Federal Sav. & Loan Ass'n v. De La Cuesta,* 458 U.S. 141, 157, 102 S.Ct. 3014, 3024, 73 L.Ed.2d 664 (1982), in which the Supreme Court stated:

> We note, however, that the incorporation of state law does not signify the inapplicability of federal law, for "a fundamental principle in our system of complex national polity" mandates that "the Constitution, laws, and treaties of the United States are as much a part of the law of every State as its own local laws and Constitution."

We do not see how the bringing of a state law wrongful discharge action by an employee for a discharge based on whistle blowing can interfere with the safe operation of nuclear energy plants. We agree with the Illinois Supreme Court that protection of the lives of citizens from the hazards of radioactive material concerns the states as well as the federal government. *See Wheeler v. Caterpillar Tractor Co.,* 92 Ill.Dec. at 566, 485 N.E.2d at 377.

Most state law actions for wrongful discharge are broader in scope than § 5851. Subsection (a) of the statute provides:

> **(a) Discrimination against employee**
>
> No employer ... may discharge any employee or otherwise discriminate against any employee with respect to his compensation, terms, conditions, or privileges of employment because the employee (or any person acting pursuant to a request of the employee)-

(1) commenced, caused to be commenced, or is about to commence or cause to be commenced *a proceeding* under this chapter or the Atomic Energy Act of 1954, as amended [42 U.S. C.A. § 2011 et seq.], or a *proceeding* for the administration or enforcement of any requirement imposed under this chapter or the Atomic Energy Act of 1954, as amended;

 (2) testified or is about to testify in any such *proceeding* or;

 (3) assisted or participated or is about to assist or participate in any manner *in such a proceeding* or in any other action to carry out the purposes of this chapter or the Atomic Energy Act of 1954, as amended [42 U.S.C.A. § 2011 et seq.]

42 U.S.C. § 5851(a) (emphasis added). Under the statute, there must be a proceeding, either commenced or about to be commenced, before a whistle blower is protected.[4] A state law action for wrongful discharge is triggered by an employee's discharge whether or not she has or will participate in any "proceeding" that may follow.

So also, state law remedies may be broader than those available to a whistle blower under subsection (B):

 (B) If, in response to a complaint filed under paragraph (1), the Secretary determines that a violation of subsection (a) of this section has occurred, the Secretary shall order the person who committed such violation to (i) take affirmative action to abate the violation, and (ii) reinstate the complainant to his former position together with the compensation (including back pay), terms, conditions, and privileges of his employment, and the Secretary may order such person to provide compensatory damages to the complainant. If an order is issued under this paragraph, the Secretary, at the request of the complainant shall assess against the person against whom the order is issued a sum equal to the aggregate amount of all costs and expenses (includ-

ing attorneys' and expert witness fees) reasonably incurred, as determined by the Secretary, by the complainant for, or in connection with, the bringing of the complaint upon which the order was issued.

42 U.S.C. § 5851(b)(2)(B). Although the remedies available under the statute are comprehensive, they do not include punitive damages. In this connection, it is worth nothing that in *Silkwood* the Court upheld a punitive damages award of ten million dollars. 464 U.S. at 245, 258, 104 S.Ct. at 619, 626.

Whistle blowing is not directly concerned with safety standards, only the deviation from or the flouting of them. There is no good reason for barring state remedies to whistle blowers but allowing punitive damages under state law to those who are injured by nuclear mishaps that might not have occurred if the whistle blower's complaints had been investigated. Allowing whistle blowers to proceed in state court indirectly promotes nuclear safety by subjecting the employer to the threat of a substantial jury award if it retaliates against a whistle blower by wrongfully discharging him. The economic aspect of the state law claim may induce an employer to investigate a whistle blower's complaints rather than fire her.

We hold that there is no conflict between state law actions for wrongful discharge and § 5851. In fact, the state law action may strengthen and expand the established public policy of protecting whistle blowers in the nuclear energy industry.

### III. THE STATE LAW CLAIMS

Lumbermen argues in the alternative that counts I and III fail to state causes of action under Massachusetts law. The district court did not reach this issue. "We are, of course, free to affirm a district court's decision 'on any ground supported by the record even if the issue was not pleaded, tried or otherwise referred to in

---

**4.** There is disagreement in the circuits about the statutory construction to be given to "proceeding." *See, e.g., Kansas Gas & Elec. Co. v. Brock,* 780 F.2d 1505, 1510–13 (10th Cir.1985), *cert. denied,* 478 U.S. 1011, 1011–12, 106 S.Ct. 3311, 3311–12, 92 L.Ed.2d 724 (1986).

the proceedings below.'" *Doe v. Anrig*, 728 F.2d 30, 32 (1st Cir.1984) (quoting *Brown v. St. Louis Police Department*, 691 F.2d 393, 396 (8th Cir.1982), *cert. denied*, 461 U.S. 908, 103 S.Ct. 1882, 76 L.Ed.2d 812 (1983); collecting cases).

We, therefore, turn to Lumbermen's alternative argument. Lumbermen contends that Massachusetts has never extended the breach of an implied covenant of good faith and fair dealing to salaried employees. Thus, it argues that Norris, who was a salaried employee, has failed to state a contract claim in count I. With respect to the tort claim alleged in Count III, Lumbermen contends that Norris' failure to actually blow the whistle by reporting Lumbermen to the NRC and his failure to refuse to carry out his supervisor's orders fatally undercuts his cause of action.

■ We refuse to dismiss Norris' complaint because we cannot say that "it appears beyond doubt that [Norris] can prove no set of facts which would entitle him to relief." *Lessler v. Little*, 857 F.2d 866, 867 (1st Cir.1988), *cert. denied*, — U.S. —, 109 S.Ct. 1130, 103 L.Ed.2d 192 (1989). Count I of Norris' complaint alleges bad faith termination in retaliation for his raising safety issues. The Massachusetts Supreme Judicial Court has "recogniz[ed] the general requirement in this Commonwealth that parties to contracts and commercial transactions must act in good faith toward one another." *Fortune v. National Cash Register Co.*, 373 Mass. 96, 364 N.E.2d 1251, 1256 (1977). It went on to comment that in every contract, including employment contracts, there exists an implied covenant of good faith and fair dealing. *Id.* 364 N.E.2d at 1257. Lumbermen is simply incorrect in its assertion that Massachusetts does not recognize a claim of bad faith termination by salaried employees. *See Cataldo v. Zuckerman*, 20 Mass.App. 731, 482 N.E.2d 849, *further review denied*, 396 Mass. 1103, 485 N.E.2d 188 (1985) (salaried supervisor entitled to annual bonus amounts provided for in employment contract).

■ We recognize that most Massachusetts cases dealing with the contract claim

of bad faith termination involved employees whose discharge deprived them of earned commissions. *See, e.g., Maddaloni v. Western Mass. Bus Lines, Inc.*, 386 Mass. 877, 438 N.E.2d 351 (1982); *Gram v. Liberty Mut. Ins. Co.*, 384 Mass. 659, 429 N.E.2d 21 (1981); *Fortune*, 364 N.E.2d 1251. The general rule in Massachusetts is that "lost wages and fringe benefits *unrelated to past services*" are not compensable as part of a contract claim for bad faith termination. *Maddaloni*, 438 N.E.2d at 356 (emphasis supplied). The Massachusetts cases equate an unfair denial of earned commissions with unjust enrichment. *See, e.g., Maddaloni*, 438 N.E.2d at 356.

Norris was a salaried employee but he also alleges that he "received additional benefits based on his ... tenure as an employee of Defendant." To the extent he claims that he has been deprived of additional benefits which are related to his past services, Norris has stated a claim under Massachusetts law. If Norris can prove he was entitled to additional compensation based on his past services, "his tenure," then Lumbermen would be unjustly enriched by discharging him in bad faith. It is also possible that Norris is entitled to a different measure of damages based on the circumstances of this case and considerations of public policy. *See Maddaloni*, 438 N.E.2d at 356 n. 7 ("We need not decide in what circumstances public policy may require additional damages, or a different measure of damages."). We leave this issue for the district court to decide in the first instance.

■ Count III of Norris' complaint alleges the tort of wrongful discharge:

Defendant has terminated Plaintiff in retaliation for exposing policies, practices and procedures of Defendant which impact upon the safe construction and operation of nuclear power plants, and which violate the regulations of the Nuclear Regulatory Commission, and which expose the public to substantial risk of injury and death from nuclear accidents.

Under Massachusetts law, "[l]iability can be imposed on an employer who terminates

an at-will employee in violation of a clearly established public policy." *Hobson v. McLean Hosp. Corp.*, 402 Mass. 413, 522 N.E.2d 975, 977 (1988); *see also Mello v. Stop & Shop Cos., Inc.*, 402 Mass. 555, 524 N.E.2d 105, 106–07 (1988). We think that Massachusetts would agree with the statement by the Supreme Court of Illinois:

> The protection of the lives and property of citizens from the hazards of radioactive material is as important and fundamental as protecting them from crimes of violence, and by the enactment of the legislation cited, Congress has effectively declared a clearly mandated public policy to that effect.

*Wheeler v. Caterpillar Tractor Co.*, 92 Ill.Dec. at 566, 485 N.E.2d at 377.

Lumbermen argues that because Norris *only* made internal complaints (did not publicly blow the whistle) and complied with his supervisor's orders, he is not entitled to claim he was discharged in violation of public policy. This argument misses the target. Regardless of the public policy statement inherent in § 5851, it cannot be gainsaid that there is a strong public policy, independent of § 5851, favoring the reporting of safety hazards and violations at nuclear energy plants.

We hold that Norris has stated a cause of action under Massachusetts law in counts I and III and may proceed on those counts.

The district court's judgment is reversed and the case remanded for further proceedings consistent with this opinion.

Costs awarded to appellant.

### APPENDIX

42 U.S.C. § 5851 provides:

#### Employee protection

(a) Discrimination against employee

No employer, including a Commission licensee, an applicant for a Commission license, or a contractor or a subcontractor of a Commission licensee or applicant, may discharge any employee or otherwise discriminate against any employee with respect to his compensation, terms, conditions, or privileges of employment because the employee (or any person acting pursuant to a request of the employee)—

(1) commenced, caused to be commenced, or is about to commence or cause to be commenced a proceeding under this chapter or the Atomic Energy Act of 1954, as amended [42 U.S.C.A. § 2011 et seq.], or a proceeding for the administration or enforcement of any requirement imposed under this chapter or the Atomic Energy Act of 1954, as amended;

(2) testified or is about to testify in any such proceeding or;

(3) assisted or participated or is about to assist or participate in any manner in such a proceeding or in any other action to carry out the purposes of this chapter or the Atomic Energy Act of 1954, as amended [42 U.S.C.A. § 2011 et seq.].

(b) Complaint, filing and notification

(1) Any employee who believes that he has been discharged or otherwise discriminated against by any person in violation of subsection (a) of this section may, within thirty days after such violation occurs, file (or have any person file on his behalf) a complaint with the Secretary of Labor (hereinafter in this subsection referred to as the "Secretary") alleging such discharge or discrimination. Upon receipt of such a complaint, the Secretary shall notify the person named in the complaint of the filing of the complaint and the Commission.

(2)(A) Upon receipt of a complaint filed under paragraph (1), the Secretary shall conduct an investigation of the violation alleged in the complaint. Within thirty days of the receipt of such complaint, the Secretary shall complete such investigation and shall notify in writing the complainant (and any person acting in his behalf) and the person alleged to have committed such violation of the results of the investigation conducted pursuant to this subparagraph. Within ninety days of the receipt of such complaint the Secretary shall, unless the proceeding on the complaint is terminated by the Secretary on the basis of a settle-

ment entered into by the Secretary and the person alleged to have committed such violation, issue an order either providing the relief prescribed by subparagraph (B) or denying the complaint. An order of the Secretary shall be made on the record after notice and opportunity for public hearing. The Secretary may not enter into a settlement terminating a proceeding on a complaint without the participation and consent of the complainant.

(B) If, in response to a complaint filed under paragraph (1), the Secretary determines that a violation of subsection (a) of this section has occurred, the Secretary shall order the person who committed such violation to (i) take affirmative action to abate the violation, and (ii) reinstate the complainant to his former position together with the compensation (including back pay), terms, conditions, and privileges of his employment, and the Secretary may order such person to provide compensatory damages to the complainant. If an order is issued under this paragraph, the Secretary, at the request of the complainant shall assess against the person against whom the order is issued a sum equal to the aggregate amount of all costs and expenses (including attorneys' and expert witness fees) reasonably incurred, as determined by the Secretary, by the complainant for, or in connection with, the bringing of the complaint upon which the order was issued.

#### (c) Review

(1) Any person adversely affected or aggrieved by an order issued under subsection (b) of this section may obtain review of the order in the United States court of appeals for the circuit in which the violation, with respect to which the order was issued, allegedly occurred. The petition for review must be filed within sixty days from the issuance of the Secretary's order. Review shall conform to chapter 7 of title 5. The commencement of proceedings under this subparagraph shall not, unless ordered by the court, operate as a stay of the Secretary's order.

(2) An order of the Secretary with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in any criminal or other civil proceeding.

#### (d) Jurisdiction

Whenever a person has failed to comply with an order issued under subsection (b)(2) of this section, the Secretary may file a civil action in the United States district court for the district in which the violation was found to occur to enforce such order. In actions brought under this subsection, the district courts shall have jurisdiction to grant all appropriate relief including, but not limited to, injunctive relief, compensatory, and exemplary damages.

#### (e) Commencement of action

(1) Any person on whose behalf an order was issued under paragraph (2) of subsection (b) of this section may commence a civil action against the person to whom such order was issued to require compliance with such order. The appropriate United States district court shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such order.

(2) The court, in issuing any final order under this subsection, may award costs of litigation (including reasonable attorney and expert witness fees) to any party whenever the court determines such award is appropriate.

#### (f) Enforcement

Any nondiscretionary duty imposed by this section shall be enforceable in a mandamus proceeding brought under section 1361 of title 28.

#### (g) Deliberate violations

Subsection (a) of this section shall not apply with respect to any employee who, acting without direction from his or her employer (or the employer's agent), deliberately causes a violation of any requirement of this chapter or of the Atomic Energy Act of 1954, as amended [42 U.S.C.A. § 2011 et seq.].