William H. HUTSON, PH.D., Plaintiff,

v.

The ANALYTIC SCIENCES CORPORATION, John E. (Jack) Bortz, and Raymond A. Nash, Defendants.

Civ. A. No. 91–12243–WGY.

United States District Court,
D. Massachusetts.

Aug. 15, 1994.

---

Joan A. Lukey, Scott A. Roberts, Hale & Dorr, Boston, MA, for plaintiff.

Rosemary M. Allen, Thomas R. Murtagh, Kenneth M. Bello, Nancy L. Walsh, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, MA, for Analytic Sciences Corp., John E. Bortz.

### *MEMORANDUM ON THE PUBLIC POLICY ISSUE*

COLLINGS, United States Magistrate Judge.

In Count I of his first amended complaint (# 86), the plaintiff has alleged that he was wrongfully terminated from his employment by the corporate defendant in contravention of public policy. Under Massachusetts law, "[t]he judge must determine whether, on the evidence, there is a basis for finding that a well-defined, important public policy has been violated." *Mello v. Stop & Shop Cos.*, 402 Mass. 555, 561 n. 7, 524 N.E.2d 105, 108 n. 7 (1988). *Accord, Mistishen v. Falcone Piano Co., Inc.*, 36 Mass. App.Ct. 243, 245, 630 N.E.2d 294, 295 (1994) quoting *Smith–Pfeffer v. Superintendent of the Walter E. Fernald State School*, 404 Mass. 145, 151, 533 N.E.2d 1368, 1372 (1989). The defendants have filed a memorandum of law raising threshold questions with respect to the source and scope of public policy in the context of a purported wrongful discharge of an at-will employee. (# 113) In turn, the plaintiff has submitted a memorandum supporting his position. (# 116) The matter was heard at the pre-trial conference.[1] At the outset, the Court shall address the first issue presented, that being whether federal law can serve as a source of Massachusetts public policy.

In the absence of an explicit Massachusetts state court decision on point, the defendants have proffered certain Illinois cases as being "particularly instructive" given that Illinois shares with Massachusetts "a similar state-based focus." The defendants' reliance on the Illinois line of cases is to some extent

---

1. Pursuant to Title 28 U.S.C. § 636(c), the parties have consented to have the case referred to the undersigned for all proceedings, including a jury trial and the entry of judgment, and the District Judge to whom this case is assigned has referred the case for that purpose.

misplaced. It is true that in the *Palmateer* decision, the Supreme Court of Illinois, when generally defining "clearly mandated public policy" stated that "[i]t is to be found in the State's constitution and statutes and, when they are silent, in its judicial decisions." *Palmateer v. Int'l Harvester Co.*, 85 Ill.2d 124, 130, 52 Ill.Dec. 13, 15, 421 N.E.2d 876, 878 (1981) (citations omitted). That pronouncement notwithstanding, five years later in a case not cited by the defendants (or the plaintiff), the Illinois Supreme Court determined that the plaintiff had stated a cause of action for discharge in violation of public policy based solely on federal statutes, i.e., the Atomic Energy Act of 1954 and the Energy Reorganization Act. The federal laws were deemed to "clearly enunciate a public policy which is national in scope." *Wheeler v. Caterpillar Tractor Co.*, 108 Ill.2d 502, 506, 92 Ill.Dec. 561, 564, 485 N.E.2d 372, 375 (1985). The Court ruled that:

> The protection of the lives and property of citizens from the hazards of radioactive material is as important and fundamental as protecting them from crimes of violence, and by the enactment of the legislation cited, Congress has effectively declared a clearly mandated public policy to that effect.

*Id.* at 511, 92 Ill.Dec. at 566, 485 N.E.2d at 377.

The First Circuit specifically relied upon, and quoted from, *Wheeler* in *Norris v. Lumbermen's Mutual Casualty Co.*, 881 F.2d 1144, 1153 (1 Cir., 1989). In *Norris,* the First Circuit concluded that Massachusetts would recognize a cause of action for wrongful discharge in violation of a clearly established public policy, in that instance premised only on federal energy legislation. *Id.*

■ The case of *Pratt v. Caterpillar Tractor Co.*, 149 Ill.App.3d 588, 102 Ill.Dec. 900, 500 N.E.2d 1001 (1986), *appeal denied,* 114 Ill.2d 556, 107 Ill.Dec. 68, 506 N.E.2d 959 (1987), decided after *Wheeler,* did not determine "whether a purported violation of public policy can be based strictly on federal law" as the defendants contend. Rather, the Illinois Appellate Court held that the federal statutes at issue, the Foreign Corrupt Practices Act and the Export Administration Act,

... do not fall within the parameters of the *Wheeler* holding in that they cannot be said to enunciate a clearly mandated policy of this state.... The common theme of our courts' decisions sustaining a plaintiff's cause of action for retaliatory discharge is there must be a State public policy at issue. We find no such public policy involved in the instant case and conclude that exclusively Federal concerns cannot support a State common law remedy as alleged in this case.

*Pratt,* 149 Ill.App.3d at 591, 102 Ill.Dec. at 902, 500 N.E.2d at 1003.

Thus, *Pratt* stands for the proposition that not all federal laws will serve as a foundation for a wrongful discharge claim under Illinois law; more precisely, the federal law must concern or involve state public policy to support a state cause of action.

The petition to appeal the intermediate court decision in *Pratt* was denied by the Supreme Court of Illinois. *Pratt v. Caterpillar Tractor Co.*, 114 Ill.2d 556, 107 Ill.Dec. 68, 506 N.E.2d 959 (1987). In dissent, one Justice wrote as follows:

> I would allow leave to appeal in this case to determine the extent to which statements of public policy by the federal government are cognizable in State courts and protected by civil actions for retaliatory discharge. Considering both the supremacy clause of the United States Constitution and the plenary authority of the federal government in matters of foreign affairs (*United States v. Pink* (1942), 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796, it is difficult to conceive of a United State [sic] foreign policy which is not also the policy of this State and intended for the protection of its citizens. This court has recently reiterated that the federal government defines "National foreign policy" (*Springfield Rare Coin Galleries, Inc., v. Johnson* (1986), 115 Ill.2d 209 [221], 234, 104 Ill.Dec. 798, 503 N.E.2d 355 [300], quoting *Zschernig v. Miller* (1968), 389 U.S. 429, 440, 88 S.Ct. 664, 671, 19 L.Ed.2d 683, 692); we have also recognized that "by the enactment of * * *legislation* * *, Congress [can] effectively declare[ ] a clearly man-

dated public policy" (*Wheeler v. Caterpillar Tractor Co.* (1985), 108 Ill.2d 502, 511, 92 Ill.Dec. 561, 485 N.E.2d 372). If the Foreign Corrupt Practices Act and the Export Control Act do not represent policies adopted by the citizens of the fifty States, then whose policies are they?

To deny civil relief in this case ill serves our national goals while at the same time it teaches disrespect for the law. The State of Illinois should not be so parochial as to place less importance on respect for federal law than it does on the laws of the State, yet such an attitude is manifest in the appellate court's decision. The appellate court has sent a message that although Illinois law and policy will not be subordinated to the desires of unscrupulous employers to force their employees to engage in or cover-up criminal activity, those unscrupulous desires will not be subordinated to the laws and policies of Congress. It is a message which I do not believe reflects the intentions of Illinois, her people or a nation I like to think of as "one" and "indivisible".

*Pratt, supra,* 114 Ill.2d at 556–57, 107 Ill.Dec. at 68–69, 506 N.E.2d at 959–960.

In 1993, the Supreme Court of New Jersey specifically disagreed with the *Pratt* decision, holding that the Foreign Corrupt Practices Act was a state policy in New Jersey. *D'Agostino v. Johnson & Johnson, Inc.,* 133 N.J. 516, 531, 628 A.2d 305, 313–314 (1993). The Court found support for this conclusion in the Supreme Court Justice's dissenting opinion in *Pratt* as well as in decisions by the Washington Supreme Court, *Thompson v. St. Regis Paper Co.,* 102 Wash.2d 219, 685 P.2d 1081 (1984), and the federal district court in Maryland, *Adler v. American Standard Corp.,* 538 F.Supp. 572 (D.Md.1982), both of which adopted the Foreign Corrupt Practices Act as a policy of the respective states. Moreover, the New Jersey Supreme Court unequivocally stated that "[f]ederal law and policy can constitute New Jersey's clear mandate of public policy.... [and] decisions of this Court and other courts ... have found a wrongful-discharge cause of action when based on a clearly-articulated federal policy" citing five examples including the *Wheeler*

case. *D'Agostino,* 133 N.J. at 528–529, 628 A.2d at 312 (citations omitted). It is of interest to note that the decisions cited by the Supreme Court of New Jersey involved a variety of federal legislation, from the Clean Air Act to OSHA. *Id.*

In the case of *Supermarkets General Holdings Corp. v. Wenberg,* 1992 WL 72477 (D.Mass.1992), Judge Zobel assumed "without deciding, that compliance with the federal securities laws is a sufficiently strong public policy to trigger liability for discharge of a whistle-blower" under Massachusetts law. *Id.* at *2. Determination of the issue was averted because the judge concluded that the plaintiff failed to raise a genuine issue of fact with respect to the causal connection between the whistle-blowing and his termination. Applying Massachusetts law, Chief Judge Cabranes decided, inter alia, that a plaintiff could state a cause of action for wrongful discharge in violation of public policy based upon alleged violations of federal and state securities laws. *Sullivan v. Massachusetts Mutual Life Insurance Company,* 802 F.Supp. 716, 723 (D.Conn.,1992).

As previously acknowledged, to date, the state courts of Massachusetts have yet to address directly the issue of whether federal law per se can enunciate a clearly mandated state policy. At the same time, there is no reason to believe that the Massachusetts Supreme Judicial Court would not adopt such a position as indeed the First Circuit has held. The decision in *Flesner v. Technical Communications Corporation,* 410 Mass. 805, 575 N.E.2d 1107 (1991) is enlightening. In *Flesner,* the plaintiff alleged that he was wrongfully discharged for cooperating with Customs officials in a federal investigation. The SJC determined that if it was proven that the employer intentionally interfered with such an investigation, "a wrongful discharge in violation of public policy" would have occurred. *Id.* at 811, 575 N.E.2d at 1111. Noting that "it is the public policy of this Commonwealth to encourage cooperation with ongoing criminal investigations," the SJC cited Massachusetts statutes and case-law, as well as a "Cf." citation to a federal statute. *Id.* at 810, 575 N.E.2d at 1110–1111.

In *Flesner*, the Supreme Judicial Court wrote:

In *Smith–Pfeffer v. Superintendent of the Walter E. Fernald State School*, 404 Mass. 145, 149–150, 533 N.E.2d 1368 (1989), we stated that redress is available for employees who are terminated "for asserting a legally guaranteed right (e.g., filing workers' compensation claim) for doing what the law requires (e.g., serving on a jury), or for refusing to do that which the law forbids (e.g., committing perjury) . . .

\* \* \* \* \* \*

We think that the reasons for imposing liability in the categories of cases set forth in *Smith–Pfeffer* also justify redress in certain circumstances for employees terminated for performing public deeds, even though the law does not absolutely require the performance of such a deed. [FN 3]

*Flesner*, 410 Mass. at 810–811, 575 N.E.2d at 1110–1111.

Footnote 3 reads " '[w]histleblowing,' for example, may fall into this category." *Flesner, supra,* 410 Mass. at 811, 575 N.E.2d at 1111 (citations omitted). The defendants observe that in each of the cited cases listed in footnote 3, a violation of state statutes was alleged. This is not to say, however, that the invocation or consideration of federal law is inappropriate. For instance, in *McQuary v. Bel Air Convalescent Home, Inc.,* 69 Or.App. 107, 684 P.2d 21 (1984), the Oregon Court of Appeals wrote:

The [state] legislature's desire to protect patients, which reflects a comparable concern on the part of the federal government, 42 CFR § 405.112(1)(k); 42 CFR § 442.311, shows that that protection is an important public policy analogous to the performance of jury duty or the avoidance of defamation, policies which the Supreme Court has found to justify wrongful discharge claims.

*Id.* at 110, 684 P.2d at 23.

Similarly, although the case of *Garibaldi v. Lucky Food Stores, Inc.,* 726 F.2d 1367 (9 Cir., 1984) involved the violation of a California state statute, an earlier California state decision concluded that an employee could maintain a tort action for wrongful discharge based on a public policy rooted in federal and state law. *See Tameny v. Atlantic Richfield Company,* 27 Cal.3d 167, 170, 164 Cal.Rptr. 839, 840, 610 P.2d 1330, 1331 (1980); *see also, Harless v. First Nat'l Bank in Fairmont,* 162 W.Va. 116, 246 S.E.2d 270 (1978) (public policy manifest in state and federal consumer credit and protection laws).

Based on the foregoing caselaw, as well as the notable lack of contrary authority, the Court concludes that the Massachusetts Supreme Judicial Court would approve consideration of federal law as a potential source of a well-defined important public policy of the Commonwealth.

█ Turning to the second issue, the scope of public policy, four areas of public policy concern are alleged to have been implicated in this case. In reverse order, the plaintiff contends that his employer improperly billed the government for time spent testing and implementing the SEAWATCH technology. As a consequence of questioning the propriety of those time charges, the plaintiff alleges that he was terminated by the corporate defendant.

Several federal statutes prohibiting fraud against the government have been identified, including Title 18 U.S.C. § 287 which provides:

Whoever makes or presents to any person or officer in the civil, military, or naval service of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent, shall be imprisoned not more than five years and shall be subject to a fine in the amount provided in this title.

*Id.*

The Massachusetts General Laws include a parallel provision, to wit:

Whoever makes or presents to any employee, department, agency or public instrumentality of the commonwealth, or of any political subdivision thereof, any claim upon or against any department, agency, or public instrumentality of the commonwealth, or any political subdivision thereof, knowing such claim to be false, fictitious,

or fraudulent, shall be punished by a fine of not more than ten thousand dollars or by imprisonment in the state prison for not more than five years, or in the house of correction for not more than two and one-half years, or both.

Mass.Gen.L. ch. 266, § 67B; *see also*, Mass. Gen.L. ch. 93, § 9B.

It cannot be gainsaid but that these two nearly verbatim statutes plainly express a public policy against defrauding the government, be it state or federal, by criminalizing such conduct. If the plaintiff was discharged in order to squelch further inquiry into, or disclosure of, purportedly fraudulent claims for payment, the Court is of the view that he had a claim for wrongful termination against public policy under Massachusetts law.

■ A comparable situation is presented with respect to the plaintiff's allegation that his discharge "was in retaliation for identifying, and to prevent him from disclosing, the alleged impropriety of TASC's substitution of the MAD algorithm for the SVD algorithm in the SEAWATCH technology." (# 116 at p. 14) The corporate defendant had received a "sole source" contract from the Navy based upon the proprietary SEAWATCH technology. By substituting the non-proprietary MAD algorithm, the plaintiff assertedly believed that his employer was violating government procurement statutes and regulations.

The federal public policy with respect to defense procurement has been clearly stated:

> (a) The Congress finds that in order to ensure national defense preparedness, conserve fiscal resources, and enhance defense production capability, it is in the interest of the United States that property and services be acquired for the Department of Defense in the most timely, economic, and efficient manner. It is therefore the policy of Congress that—
>
> (1) full and open competitive procedures shall be used by the Department of Defense in accordance with the requirements of this chapter;
>
>     \*    \*    \*    \*    \*    \*
>
> (b) Further, it is the policy of Congress that procurement policies and procedures for the agencies named in section 2303 of this title shall in accordance with the requirements of this chapter—
>
> (1) promote full and open competition;

Title 10 U.S.C. § 2301(a)(1) and (b)(1).

The Supreme Judicial Court of Massachusetts has articulated a similar policy underlying the Commonwealth's procurement statutes and regulations. Citing cases dating back to 1925, the SJC has reiterated that:

> The purpose of competitive bidding statutes is 'to establish genuine and open competition after due public advertisement in the letting of contracts for ... (public) work, to prevent favoritism in awarding such contracts and to secure honest methods of letting contracts in the public interests.'

*Datatrol Inc. v. State Purchasing Agent*, 379 Mass. 679, 696, 400 N.E.2d 1218, 1228 (1980) (citations omitted).

As is apparent, the primary thrust of both the federal and state public policies vis-a-vis government procurement is to foster open, fair and full competition. To that end, statutes and extensive regulations have been promulgated at both the state and federal levels. *See*, e.g., 802 C.M.R. 200 *et seq.;* 48 C.F.R. 601 *et seq.* In light of the congruence of the federal and state policies, as well as the statutory and regulatory schemes, the Court concludes that Massachusetts would recognize a whistleblowing claim predicated upon revelation of an alleged attempt to circumvent competition in violation of government procurement laws. Such an act would constitute "an important public deed" in furtherance of a long-standing basic public policy of the Commonwealth. *Flesner, supra,* 410 Mass. at 810–811, 575 N.E.2d at 1111.

■ The final two public policy claims advanced are premised upon alleged violations of federal law involving national defense. The plaintiff asserts that he was the victim of a retaliatory discharge because he identified and disclosed potential defects or flaws in the SEAWATCH technology as applied by the corporate defendant.

Pursuant to the criminal laws of the United States:

Whoever, with intent to injure, interfere with, or obstruct the national defense of the United States, willfully makes, constructs, or attempts to make or construct in a defective manner, any national-defense material, national-defense premises or national-defense utilities, or any tool, implement, machine, utensil or receptacle used or employed in making, producing, manufacturing, or repairing any such national-defense material, national-defense premises or national-defense utilities, shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

Title 18 U.S.C. § 2156(a).

Further, Congress has enacted legislation specifically aimed at protecting employees who disclose, based upon reasonable belief, violations of federal law by their employers, particularly as they relate to defense contracts. *See*, e.g., Title 10 U.S.C. § 2409(a); Title 10 U.S.C. § 2409a(b).

Although the plaintiff has not cited any comparable provisions in Massachusetts law, federal policy with respect to national defense by its very nature is not limited to merely federal concerns. To the contrary, such policy inures to the benefit of each state in the union and every citizen in the country. Surely, national defense statutes and policies are equally as "important and fundamental" to the safety, welfare and protection of Massachusetts citizens, if not more significant than, federal energy legislation. *See Wheeler, supra*, 108 Ill.2d at 511, 92 Ill.Dec. at 566, 485 N.E.2d at 377.

Although the law of the Commonwealth admittedly is not clear on the point, this Court in any event is bound by the First Circuit precedent in *Norris*. In that case, the Court concluded that "[t]he Federal Government has preempted the field where the matter at issue directly involves nuclear safety concerns." *Norris, supra*, 881 F.2d at 1149. Despite the fact that state legislation in the area is largely preempted, i.e., there would be no Massachusetts statutes directly relevant, the First Circuit concluded that the federal policy regarding "protection of the lives of citizens from the hazards of radioactive material concerns the states as well as the federal government." *Id.* at 1150 (cita-

tion omitted). Finding "that there is a strong public policy ... favoring the reporting of safety hazards and violations at nuclear energy plants", the Court held that an employee who was allegedly terminated for engaging in such activity had stated a cause of action for wrongful discharge under Massachusetts law. *Norris, supra*, 881 F.2d at 1153.

This Court finds that federal policy regarding national defense is of paramount importance to the vital interests of the populace of Massachusetts. Following the *Norris* decision, in these circumstances, it must be concluded that the Commonwealth would adopt the federal policy as its own. The federal law reflects a clearly established public policy that encourages the disclosure of defects in any national defense material by employees of defense contractors. To the extent that the plaintiff was fired for identifying such potential defects, the Court believes that he would have a cause of action for wrongful discharge under Massachusetts law.

■ This discussion applies equally to the strong public policy concerning the protection of classified information related to national defense embodied in federal statutes, regulations and directives. The underpinning of this policy was succinctly stated by President Eisenhower: "... it is mandatory that the United States protect itself against hostile or destructive activities by preventing unauthorized disclosures of classified information relating to the national defense ..." Appendix to Plaintiff's Memorandum, Exh. A, Executive Order No. 10865, 25 F.R. 1583. The importance of this public policy is underscored by the fact that it is a criminal offense knowingly to fail to report that a document relating to the national defense has been improperly abstracted. *See* Title 18 U.S.C. § 793(f)(2).

The plaintiff contends that his termination resulted from his actions in reporting that defendant John E. Bortz abstracted, copied and distributed a classified document related to national defense. Once again, applying the *Norris* reasoning, the Court finds that Massachusetts would embrace the plainly ar-

ticulated, significant federal policy of protecting information related to national defense. If the plaintiff was fired for the reasons that he alleges, he would have a claim for wrongful discharge in violation of public policy under Massachusetts law.