**Maura L. TIGHE, Plaintiff,**

v.

**CAREER SYSTEMS DEVELOPMENT CORPORATION, Defendant.**

Civil Action No. 91–40185.

United States District Court,
D. Massachusetts.

Feb. 9, 1996.

will be filed at a later date.

Wendy A. Kaplan, Boston, MA, for Plaintiff.

James W. Nagle, Bradford J. Smith, Goodwin, Proctor & Hoar, Boston, MA, for Defendant.

## MEMORANDUM OF DECISION

GORTON, District Judge.

Plaintiff in the above-entitled matter, Maura Tighe ("Tighe"), filed an action against her former employer, Career Systems Development Corporation ("Career Systems"), alleging that she had been wrongfully discharged in contravention of public policy. After hearing and evaluating the evidence produced by the parties during a three-day bench trial, this Court finds for the defendant.

## I. *Findings of Fact*

Defendant, Career Systems Development Corporation ("Career Systems") is a for-profit Delaware corporation with its principal place of business in Rochester, New York. Career Systems operates 13 Job Corps centers under the Job Corps Program administered by the United States Department of Labor ("DOL"). That program, established by federal statute, is designed to provide intensive education, vocational training, work experience, counseling, and other related activities for economically disadvantaged youths ranging in age from 16 to 22. The program's principal aim is to assist those young individuals to become responsible, employable and productive citizens. *See* 29 U.S.C. § 1691 et seq.

Job Corps centers are facilities with both residential and non-residential components, where students receive necessary services such as counseling, vocational training and education. 29 U.S.C. § 1697. Many of the centers are operated by private contractors such as the defendant.

Contracts between the DOL and private contractors establish student enrollment goals which can affect the amount of funds received by the contractor, and Job Corps centers are heavily regulated by the DOL and federal regulations. As part of that federal oversight, regional office representatives of the Department provide support and training resources for Job Corps centers and DOL officials make regular site visits to the centers. Moreover, the DOL performs an intensive annual on-site review of each Job Corps center. The DOL also requires contractors to perform internal audits and to submit quarterly status reports for each center to the DOL.

On June 1, 1990, Career Systems entered into a contract with the DOL to operate the Grafton Job Corps Center ("GJCC") in Grafton, Massachusetts. Prior to that time, GJCC was operated by another private contractor, the Training Development Corporation ("TDC"). After awarding the GJCC

contract to Career Systems, the DOL required the defendant to submit monthly status reports to monitor the progress being made to correct substantial operational problems which existed under the TDC regime. In October, 1990, Career Systems performed an internal audit under the direction of its Executive Director, Robert Janke ("Janke"), to review its operation of the GJCC.[1] A copy of the report prepared as a result of the audit was provided to the DOL.

In October, 1989, plaintiff, Maura L. Tighe ("Tighe") was hired by TDC to work as the GJCC Recreation Technician and Substance Abuse Coordinator. When Career Systems took over management of the GJCC in June, 1990, it hired Tighe to be the Counseling Supervisor at the Center. Plaintiff's direct supervisor after the takeover was the Deputy Director of Group Life, William Peterman ("Peterman").

As Counseling Supervisor, Tighe's primary responsibilities were to supervise four staff counselors and oversee the counseling services provided to students at the GJCC. The counseling staff at Job Corps centers provides social, personal, educational and vocational counseling to both residential and non-residential students. Neither the Counseling Supervisor nor the staff counselors provide professional medical or psychiatric counseling to students, however. Rather, the students' medical and mental health needs are addressed as part of the center's Health Services program, which includes a part-time Mental Health Consultant and access to off-site professional medical and psychiatric services. During the period she was employed as Counseling Supervisor, Tighe was a Licensed Social Worker ("LSW"). Under applicable Massachusetts regulations, 258 CMR 12.01 et seq., she was not authorized to diagnose or assess mental illness, to perform psychotherapy or to provide the mental health component of crisis intervention without supervision.

As required by contract and federal regulations, counseling and other mental-health related services at the GJCC were supervised by a Mental Health Consultant ("MHC"), Darlene Corbett ("Corbett"). As MHC, Corbett was responsible for providing training to center employees and serving as a liaison between the Center and outside medical professionals. If a student exhibited mental or emotional health problems, the MHC was available to evaluate the student's condition and make any necessary referral to a professional therapist or hospital.[2] Corbett worked between six and eight hours per week at the GJCC and was required to spend at least fifty percent of that time training staff.

In December, 1990, operations at the GJCC deteriorated, particularly in the residential life area. Following a fire in one of the GJCC dormitories, the students were sent home and the Center was closed for approximately three weeks. In the aftermath of the fire, Peterman, Tighe's direct supervisor, was terminated as Deputy Director of Group Life. Career Systems investigated the worsening situation and authored a proposal known as the "December Plan" (a copy of which was submitted to the DOL) to ameliorate the problems. No replacement as Deputy Director of Group Life was found until March 4, 1991, when Justina Virgilio was promoted to the position.

Also in December, 1990, Corbett, the MHC at the GJCC, resigned. She did so because of her dissatisfaction with what she perceived to be defendant's unresponsiveness to the mental health needs of the student population at the GJCC. After Corbett's departure, the MHC position remained vacant for several months, in part because the subcontract had to be held open for a prescribed bidding period and the replacement decision was subject to the DOL Regional Office's approval.

1. At the time, Janke was responsible for the operation of defendant's Job Corps centers in the northeastern United States, including the Grafton Center.

2. Corbett is a Licensed Independent Clinical Social Worker ("LICSW"), the most advanced license available to a social worker in Massachusetts. *See* 258 CMR 12.01 et seq. An LICSW is authorized by the regulations of the Board of Registration in Social Work to supervise social workers at a lower level of licensure, such as Tighe.

In the interim, the GJCC referred students in need of psychiatric care directly to the Marlborough Hospital, with which the Center had a contract for medical and psychiatric services. Many students were unable to keep their appointments at the Marlborough Hospital due to transportation problems at the Center caused by the refusal of Center Director, Keith Meyer ("Meyer"), to authorize such transportation.[3] With no MHC to turn to for guidance, plaintiff, in effect, had no supervision and encountered situations in which she felt "over her head" and compelled to perform services beyond her legal authorization. *See* 258 CMR 12.01 et seq. Finally, in January, 1991, the Osborn Clinic entered into an agreement with the GJCC to provide mental health care to students on the Grafton campus.

Plaintiff encountered other problems at the Grafton Center as well, including:

1) the frequent tardiness and inaccuracy of the "Morning Report," the chief tool used by counselors to track down students who were away without leave ("AWOL"),

2) Meyer's refusal to allow students to resign from the Job Corps Program and his pressuring of staff to list students as AWOL rather than terminated, in order to have records indicate a larger student population,

3) the inappropriate use of counseling staff to accompany GJCC students on shopping trips,

4) resistance to her requests for computer system training to improve Participant Performance Evaluation Panels ("P/PEPS") scheduling, and payment of student stipends, and

5) Meyer's objection to and refusal to implement DOL-mandated programs for young women known as Women in Community Service ("WICS") programs.

---

**3.** Meyer became Center Director at the GJCC when Career Systems assumed responsibility for the Grafton facility in June, 1990. As Center Director, Meyer was the person primarily responsible for its day-to-day operation.

**4.** At trial, Meyer testified that his instructions were intended solely to ensure that interviewees

Tighe frequently brought those issues to Meyer's attention to no avail.

Executive Director Janke visited the GJCC at least weekly, and knew of at least some of the Center's deficiencies. Career Systems also knew that the annual on-site review of the GJCC by the DOL ("the annual review") was impending, and Janke warned Meyer that he would be relieved of his duties at the Grafton Center unless his performance improved. In January, 1991, Meyer received a letter from Janke reiterating that warning.

From Monday, February 25, through Friday, March 1, 1991, the DOL conducted the annual review on the GJCC campus. A key component of the annual review consisted of interviews of numerous GJCC employees by members of a DOL review team. Prior to the review, Center Director Meyer circulated a memorandum to GJCC staff directing them be "honest and responsive" and to "free[ly] express [their] feelings and concerns regarding [Center operations]" to the DOL. As a matter of routine, however, Meyer instructed staff to answer "yes, sir," "no, sir," or "yes, ma'am," "no, ma'am" and not to volunteer information to the DOL. Meyer reiterated those directions to Tighe, who became concerned that she was being instructed to cover up program deficiencies.[4]

Plaintiff expressed her concerns to the Human Resources Director at the GJCC, Kristin Burns ("Burns"). Tighe told Burns that she was going to report to the DOL "what was going on," and Burns responded that Tighe would be fired and would never work for another Job Corps Center in the country. At trial, Burns acknowledged that, in her dealings with Meyer, she frequently encountered the same difficulties testified to by Tighe, particularly with respect to his difficulty in communicating with women.

During the annual review, Tighe was interviewed privately over a two-day period by

---

were polite (i.e., that they would not respond "yup" or "nope") and spoke only of matters which were within the scope of their knowledge and their area of expertise. This Court finds that Meyer's instructions did not constitute nor were accompanied by a threat of reprisal or termination.

Donald Scott ("Scott"), a DOL representative. Other staff counselors were interviewed as well. During her interview, plaintiff told Scott about many of the problems at the Grafton Center, including:

1) the frequent tardiness and inaccuracy of the Morning Report,

2) the absence of a Mental Health Consultant,

3) incidents of hazing and drug use,

4) the failure to implement female enhancement programs,

5) statistical manipulation and efforts to pressure students to remain in the program, and

6) problems encountered by the failure to transport students to off-site psychotherapy appointments, thereby requiring Tighe to render unauthorized and unsupervised services.

Plaintiff also informed Scott of the pre-interview comments Meyer and Burns had made to her. Scott's only reply was that he could not guarantee plaintiff's confidentiality. Following the interview, Tighe returned to Burns' office and informed her that she had not merely answered "yes, sir," "no, sir," or "yes, ma'am," "no, ma'am." Burns expressed the opinion that plaintiff would be fired. Aside from that communication, no one from Career Systems spoke to or asked Tighe about the substance of her interview with the DOL or about her continued employment at the GJCC.

On March 1, 1991, the last day of the annual review, the DOL conducted a "brief-out" on the Grafton campus, which was attended by senior staff (including plaintiff, Burns, Meyer, and Janke). The DOL summarized its audit findings and delineated items of concern which required additional attention (many of which Tighe had raised during the course of her interview with Scott). No mention was made, however, that an employee had been threatened with termination for telling the truth during the DOL annual review. Nor was any such claim mentioned in the DOL's exhaustive written report summarizing its annual review findings which was released several weeks later.[5]

The written report, which was released after plaintiff's termination, substantiated many of the problems encountered and testified to by her, including:

1) the inadequate effort to hire a new MHC,

2) the lack of effort to implement WICS and other female enhancement programs,

3) the tardiness and inaccuracy of the Morning Report, and

4) the use of counselors to accompany students on shopping trips.

The written report also observed that the GJCC had been listing students who had resigned from the program as AWOL, a practice "done to maintain an acceptable [enrollment figure]." Ex. 8 at 62. The report further ordered that "students must be reported as terminated when they terminate," and that the Center "should focus on retention not statistical manipulation." *Id.*

On March 6, 1991, five days after the "brief-out" with the DOL, Tighe and three of the staff counselors, Vicki Bartlett, Rebecca Baller, and Cynthia Frongillo drafted a list of demands detailing changes they wanted to have implemented at the GJCC. The counselors were motivated by their concern for the students and their frustration at perceived mismanagement by the administration at the GJCC. The memorandum listed 14 issues "which warrant[ed] resolution," including, *inter alia,*

1) timely receipt of the Morning Report,

2) use of the computer system to schedule P/PEPS,

3) hiring a Mental Health Consultant,

4) development of a Crisis Intervention Program,

5) development of a plan for shopping trips "utilizing appropriate staff",

6) development of a written policy on counselors' transporting of students,

5. Career Systems' contract with the DOL was not terminated after the 1991 annual review, nor was it sanctioned for any of the operational problems identified during the audit.

7) support of WICS and other female enhancement programs, and

8) the end of "unethical statistical manipulation."

Exhibit 3. The memorandum, which was signed by all of the counselors, requested that a DOL mediator attend a meeting between the Counseling Department and the GJCC administration, and concluded that "[a]s of 1:00 p.m. on Wednesday, March 6, 1991, the Counseling Department has no other option but to cease services." [6]

Tighe and the four staff counselors proceeded to Meyer's office, where a senior staff meeting was scheduled to take place. Plaintiff handed the memorandum to Meyer, and, receiving no response, led the four staff counselors off the GJCC campus.

When the counseling staff drove away from the Center, the GJCC was left with no residential counseling services. Tighe had made no provision for others to provide counseling services to the GJCC enrollees during the counselors' walkout, nor had she informed her supervisor, Justina Virgilio, of her plan.[7] The counselors then faxed a copy of the list of their demands to the DOL and the plaintiff subsequently phoned the Department to verify its arrival.

After Tighe and the other counselors delivered their demand letter, Meyer called Career Systems' corporate headquarters in Rochester, New York, and informed Janke of the counselors' walkout. Meyer faxed a copy of the list of demands to Janke, who, in turn, sought advice about how to proceed from defendant's Chief Executive Officer, Herbert Watkins ("Watkins"), President, Charles Grundman ("Grundman"), and Director of Human Resources, James Hamilton ("Hamilton"). It was decided that 1) the DOL would be immediately informed of the situation, 2) Janke and Hamilton would contact the GJCC to gather more information about what had happened, and 3) Hamilton would contact legal counsel about what actions, if any, could be taken by the company to respond to the employees' walkout.

Janke and Hamilton phoned Burns at the GJCC, told her that the corporate office would decide how to proceed, and asked her to contact each of the counselors. Later that same day, Janke and Hamilton spoke with Burns and Meyer about the situation at the Grafton Center. Meyer credibly testified that 1) he was unaware of what Tighe had told the DOL during her interview with Scott, 2) that he provided his input to Janke and Hamilton with respect to the walkout, 3) that he did not participate in the ultimate decision to terminate plaintiff (although he concurred in the decision upon learning of it), and 4) that he was unaware of what effect, if any, his opinion had on the ultimate decision to terminate the plaintiff.

Suspecting that the employees might have engaged in "protected concerted activity" under the labor laws, Hamilton phoned corporate counsel on March 6 to inform them that a supervisor had led her department in a walk-out. At trial, Hamilton testified, credibly, that after consulting counsel, he believed that 1) under the National Labor Relations Act ("NLRA") the four staff counselors could not be terminated for their action, although they could be reprimanded, but 2) Ms. Tighe, as a supervisor, was not protected by the NLRA.[8] Hamilton carried that advice into the meeting held in Rochester on the following day to determine how to respond to the counselors' action.

On the morning of March 7, 1991, Watkins, Grundman, Janke, and Hamilton met to discuss what disciplinary action to take, if any. The executives reviewed the circumstances of the walkout, the legal advice which Hamilton had received, and the list of demands included in the March 6 memorandum authored by the counselors. Janke expressed surprise at

---

**6.** One of the staff counselors, Kenneth McClain ("McClain"), testified that he played no role in drafting the memorandum but felt pressured to sign the list of demands, in part, because plaintiff was his supervisor.

**7.** Two days earlier, Virgilio had been promoted to the position of Deputy Director of Group Life

(replacing Peterman), and as such assumed some responsibility for the issues mentioned in the Counselors' list of demands.

**8.** This Court does not consider the accuracy of that legal advice but simply finds that Hamilton sincerely believed the advice to be correct.

the memorandum's demands, in light of the fact that, in his opinion, the GJCC had already taken (and was continuing to take) steps aimed at addressing many of the specific issues raised in the memorandum.

Before adjourning the meeting, the group decided that Tighe should be terminated because 1) as a supervisor and member of management, her actions were "irresponsible," and 2) she led the walkout and did nothing to dissuade the staff counselors from abandoning their jobs. The group decided to retain the staff counselors, however, reasoning that labor law prohibited their termination (although not other forms of discipline) and that the counselors may have been intimidated into participating in the walkout. At the time that the decision to terminate Tighe was made, none of the four corporate executives knew about either the specific disclosures made by Tighe to the DOL during the annual review or the supposed threats made to plaintiff by management employees in Grafton.[9]

Following the decision to terminate plaintiff, Janke and Hamilton telephoned Burns and informed her that Tighe was to be dismissed for "gross insubordination." Burns telephoned the counselors individually and met with each of them at the Grafton campus. Three of the staff counselors returned to work at the GJCC, but received written warnings for "disregard[ing] the welfare and safety" of students at the GJCC. Those warnings were placed in their personnel files.[10] Tighe was called in to meet with Burns on March 8, 1991, and was informed by Burns that she was discharged for "gross insubordination." After her termination, plaintiff did not contact the DOL to report that she had been terminated for her comments to Scott or for any other reason.

## II. Conclusions of Law

Plaintiff contends that she was wrongfully discharged in violation of public policy. That assertion requires consideration of the "pub-

lic policy" exception to the general rules applicable to at-will employment, to which this Court now turns.

▆▆▆ Under Massachusetts law, an at-will employee such as plaintiff generally can be terminated "at any time for any reason or for no reason at all." *Folmsbee v. Tech Tool Grinding & Supply, Inc.*, 417 Mass. 388, 394, 630 N.E.2d 586 (1994). In some circumstances, however, an employer may be held liable for terminating an employee in violation of public policy. *Id.* "The judge must determine whether, on the evidence, there is a basis for finding that a well-defined, important public policy has been violated." *Mello v. Stop & Shop Companies, Inc.*, 402 Mass. 555, 561 n. 7, 524 N.E.2d 105 (1994).

▆▆ Redress is available for an at-will employee who establishes that she was discharged for 1) asserting a legally guaranteed right, 2) doing what the law requires, 3) refusing to do that which the law forbids, or 4) cooperating with an ongoing law enforcement investigation concerning her employer under a clearly expressed statutory policy encouraging such cooperation. *Wright v. Shriners Hosp. for Crippled Children*, 412 Mass. 469, 477–78, 589 N.E.2d 1241 (1992); *Smith–Pfeffer v. Superintendent of the Walter E. Fernald State School*, 404 Mass. 145, 151, 533 N.E.2d 1368 (1989). The SJC has interpreted the public policy exception narrowly; "to do otherwise would 'convert the general rule ... into a rule that requires just cause to terminate an at-will employee.'" *King v. Driscoll*, 418 Mass. 576, 582, 638 N.E.2d 488 (1994) (quoting *Smith–Pfeffer*, 404 Mass. at 150, 533 N.E.2d 1368).

▆▆ In the case at bar, plaintiff contends that her termination violated public policy because defendant fired her for cooperating with an ongoing governmental investigation. In *Flesner v. Technical Communications Corp.*, 410 Mass. 805, 810–11, 575 N.E.2d 1107 (1991), the SJC held that termination of

---

**9.** Janke credibly testified at trial that, from his experience, the DOL does not divulge the source of any particular complaint raised at interviews conducted during annual reviews. Also, Janke and Grundman credibly testified that they first learned of any "threats" made to plaintiff during

the course of the instant legal proceedings, more than one year after Tighe's dismissal.

**10.** The fourth counselor, Rebecca Baller, resigned from the GJCC.

an employee for cooperating with an ongoing criminal investigation violates public policy, even if such cooperation is not required by law. The following year, the SJC suggested that its holding in *Flesner* would be limited to situations where the legislature "had clearly expressed a policy encouraging employee cooperation" with governmental investigations. *Wright v. Shriners Hosp. for Crippled Children,* 412 Mass. 469, 473, 589 N.E.2d 1241 (1992). Accordingly, in order for plaintiff to prevail she must prove that there is a statute or regulation which clearly expresses a legislative policy encouraging such cooperation. *Cf. Wright,* 412 Mass. at 472, 589 N.E.2d 1241. Defendant maintains that Tighe cannot point to any law that expressly encourages her cooperation with the DOL and, therefore, her state law wrongful discharge claim cannot proceed. This Court disagrees.

■ Plaintiff contends that she was terminated for cooperating with an ongoing investigation by a federal agency being conducted pursuant to federal statutes and regulations. In considering whether, under Massachusetts law, an employee may base her claim for wrongful termination on an asserted violation of a well-defined public policy established by State *or* federal law, this Court agrees with the well-reasoned analysis of Magistrate Judge Collings in *Hutson v. The Analytic Sciences Corp.,* 860 F.Supp. 6, 10 (1994) ("[T]he Court concludes that the Massachusetts Supreme Judicial Court would approve consideration of federal law as a potential source of a well-defined important public policy of the Commonwealth"). Accordingly, if Tighe demonstrates that her termination violated a well-defined public policy, established by state or federal law, then she may proceed with her wrongful discharge claim against defendant.

The GJCC is just one of many Job Corps Centers that have been established pursuant to the Job Training Partnership Act ("JTPA"), 29 U.S.C. §§ 1501 et seq. There are specific provisions within both the JTPA and related regulations that encourage persons to report statutory and contractual violations to the DOL. For example, the Secretary of Labor ("the Secretary") is authorized to investigate (by questioning employees, if necessary) any matter necessary to determine compliance with the JTPA and related regulations. *See* 19 U.S.C. § 1573. Also, the Secretary may take action against any "recipient" that discharges or otherwise disciplines any individual who has filed a complaint or instituted or caused to be instituted against the recipient any proceeding or has testified against the recipient in any investigation. *Id.* at § 1574(g).

By providing that the Secretary may bring an action against any recipient that retaliates against an individual who brings a complaint against it or cooperates in an investigation of it, Congress clearly embraced a policy of encouraging the persons to inform the DOL of violations of the JTPA and related regulations by a recipient. The statute fails to define the term "recipient," however, and it is unclear whether that term applies to a private corporation, such as Career System, which contracts with the DOL to operate a Job Corps center. If Career System is not a "recipient," those statutory provisions cannot be deemed to expressly encourage its employees to cooperate with an investigation by the DOL.

The regulations promulgated by the DOL regarding complaints, hearings and investigations relating to recipients appear to suggest that § 1574 is not intended to encourage "whistleblowing" by such employees. *See generally* 20 C.F.R. § 636. That is so because the grievance procedures enumerated by the regulations, although they expressly protect persons who report violations to the DOL, do not apply to Job Corps center disputes.[11] The regulation which governs com-

---

11. The relevant regulations, entitled "Protection of Informants," provide that:

   (a) Informants. Where possible the identity of any person who has furnished information relating to, or assisted in an investigation of a possible violation of the Act will be held in confidence. . . .

   (b) Retaliation Prohibited. No person or agency may discharge, or in any other manner discriminate or retaliate against any person, or deny to any person a benefit to which that person is entitled under the provisions of the Act or the regulations because such person has filed any complaint, instituted or caused to be

plaints and disputes concerning Job Corps centers does not include a provision which protects persons who report violations to the DOL. *See* 20 C.F.R. § 638.539.

■ That regulation, however, does provide that the DOL may investigate whether "a center operator or other deliverer" has failed to comply with the JTPA and may impose the sanctions set forth in § 1574. The regulations applicable to complaints and disputes involving Job Corps centers such as GJCC thus incorporate by reference the statutory and regulatory provisions of the JTPA, which essentially protect persons who report violations of the Act to the DOL. Although one might argue that, by expressly excluding Job Corps center disputes from the general regulations governing grievances under the JTPA, the DOL intended to discourage employees of corporations such as Career Systems from informing it of potential violations of the JTPA, this Court deems it implausible that the DOL intended such a result.

To determine whether Tighe has alleged a claim for wrongful discharge in contravention of public policy, this Court also is guided by Congress' purpose in enacting the False Claim Act. Although plaintiff has not alleged, and under a literal reading of the statute could not have alleged, a cause of action under the whistleblower protection provision of that Act, 31 U.S.C. § 3730(h), the provision provides useful insight into the existence of a legislative policy encouraging the activity of persons such as plaintiff.

■ In enacting § 3730(h), Congress aimed "to make employees feel more secure in reporting fraud to the United States...." *Neal v. Honeywell, Inc.,* 33 F.3d 860, 863 (7th Cir.1994). In *Neal,* the Court determined that the statute protects employees who investigate and supply information concerning fraudulent practices of their employers to appropriate internal personnel or the government, regardless of whether or not the employee or government ultimately brings suit against the employer pursuant to 31 U.S.C. § 3129. *Id.* at 863–65. Tighe maintains that she informed the DOL that the

GJCC was manipulating student enrollment statistics in order to receive higher payments under its contract with the Department of Labor. Her actions, then, fall within the category of those which Congress intended to encourage in enacting § 3730(h).

■ Accordingly, there exist federal statutes and regulations which clearly express a legislative policy encouraging persons such as Tighe to inform the DOL of possible contractual or statutory violations by their employers.

■ Having cleared that hurdle, plaintiff next bears the burden of proving that Career Systems would not have discharged her but for her conduct protected by the public policy discussed *supra. Mello v. Stop & Shop Companies,* 402 Mass. 555, 558, 524 N.E.2d 105 (1988). Tighe must prove, therefore, that 1) she engaged in protected activity and 2) the protected activity was a "substantial or motivating factor in the adverse employment decision." *Cf. Wytrwal v. Saco School Board,* 70 F.3d 165, 170 (1st Cir.1995) (in the context of 42 U.S.C. § 1983). If plaintiff meets that burden, Career Systems must be given the opportunity to show "by a preponderance of the evidence that [it] would have reached the same decision ... even in the absence of the protected conduct." *Id.* (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 285, 97 S.Ct. 568, 575, 50 L.Ed.2d 471 (1977)). If defendant produces sufficient competent evidence to demonstrate a nondiscriminatory reason for plaintiff's termination, the burden shifts back to plaintiff to show that defendant's proffered reason is pretextual. *See Wytrwal,* 70 F.3d at 172.

■ In the case at bar, this Court concludes that Tighe engaged in protected conduct when, acting out of genuine and sincere concern, she informed the DOL representative of the numerous GJCC deficiencies during the annual review. This Court is not convinced, however, that her protected conduct was a substantial or motivating fac-

instituted any proceeding under or related to the Act, has testified or is about to testify in any such proceeding or investigation or has

provided information or assisted in an investigation.
20 C.F.R. § 636.2.

**486**

tor in her termination. As discussed *supra* in footnote 4, Meyer's ambiguous instruction that plaintiff (and all GJCC employees to whom he spoke) should answer the DOL's questions "yes, sir," "no, sir," or "yes, ma'am," "no, ma'am," and not volunteer information, unaccompanied by any threat of reprisal or termination, fails to demonstrate invidious intent on the part of defendant.

Moreover, this Court is not persuaded that Human Resources Director, Kristin Burns, who testified that she empathized with Tighe and encountered similar difficulties with Meyer regarding his poor communication skills and inability to work with women, intended her comments that plaintiff would be fired if she ignored Meyer's instructions to constitute a threat. Rather, those comments are plausibly interpreted as signifying concern on the part of Burns and her opinion that, if Meyer were to discover what plaintiff intended to do, Tighe would be fired.

Moreover, even assuming that Tighe established that her discussions with the DOL were a substantial or motivating factor in her termination, Career System proved, by a preponderance of the evidence, that she would have been terminated for leading a walkout regardless of any interaction she may have had with the DOL. Plaintiff, working in a supervisory position, formulated and participated in a plan in which the entire counseling staff abruptly walked off the job and departed the GJCC campus, leaving several hundred students without much-needed counseling services. She did so without notifying her supervisor or making arrangements for interim counseling services. That conduct warranted disciplinary action.

Janke, Hamilton, and Grundman all testified, credibly, that when they decided to terminate plaintiff, none of them knew either 1) that Tighe had allegedly been threatened with termination by Burns, or 2) the contents of her discussion with the DOL representative during the annual review. The March 7,

1991, meeting was attended by Watkins, Grundman, Janke and Hamilton, none of whom knew anything about Tighe's disclosure to the DOL. In short, the persons who made the decision to terminate Tighe credibly testified that she was terminated solely because, as a supervisor, she led a job walkout by the Counseling Department.[12]

### CONCLUSION

For the foregoing reasons, this Court concludes that plaintiff was not terminated in violation of public policy. Judgment will be entered in favor of the defendant and plaintiff's claim is, therefore, dismissed.

So Ordered.

---

**12.** This court is not persuaded that the disparate treatment of plaintiff and the four staff counselors demonstrates that defendant's proffered reason for discharging Tighe was pretextual. The Court finds that the corporate executives who made the decision to discharge the plaintiff reasonably believed that 1) plaintiff was a member of management who was unprotected by the NLRA, 2) as a member of management, she had served as a poor role model to her staff, and 3) the other staff counselors could not be terminated for their conduct and/or because they were intimidated into participation.