Patricia G. SMITH, Plaintiff,

v.

The MITRE CORPORATION, Defendant.

Civil Action No. 95–10724–RCL.

United States District Court, D. Massachusetts.

Jan. 3, 1997.

944

Theresa Finn Dever, Michael Avery, Perkins, Smith & Cohen, Boston, MA, for Patricia G. Smith.

Steven A. Kaufman, Robert B. Gordon, Daniel J. Klau, Heidi Goldstein Shepherd, Ropes & Gray, Boston, MA, for Mitre Corporation.

### MEMORANDUM AND ORDER ON MOTION TO AMEND COMPLAINT

LINDSAY, District Judge.

#### Background

In this employment discrimination case, the plaintiff, Patricia Smith (the "plaintiff" or "Smith"), has moved to amend her complaint to add three new claims. The proposed amendments would add claims for termination in retaliation for her filing a discrimination claim under Massachusetts law (Mass. G.L. c. 151B), termination in retaliation for her filing a claim under federal law (Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ["Title VII"] ), and wrongful discharge under Massachusetts common law.

The plaintiff timely filed charges against the defendant Mitre Corporation (the "defendant" or "Mitre") with the Massachusetts Commission Against Discrimination ("MCAD") and the Equal Employment Opportunity Commission ("EEOC") with respect to her original discrimination claims. In those charges she claimed that she was demoted and otherwise discriminated against in her employment with Mitre based on her age and gender.

Her proposed amendment would add claims relating to her discharge from Mitre subsequent to the filing of her original discrimination charges. On October 2, 1995, the plaintiff was notified by Mitre that she was to be terminated under a "lay-off action." She contends that the lay-off action was a pretext, and that she was, in fact, terminated in retaliation for the filing of her original charges and for the prosecution of the claims made in this lawsuit. On June 21, 1996, the plaintiff filed a charge of discrimination with EEOC stemming from the alleged retaliatory termination, and on June 24, 1996, she filed a similar charge with the MCAD.

The charge filed with the EEOC was timely, in that it came within the 300-day limit applicable in Massachusetts. *See* 42 U.S.C. § 2000e-5(e); *Isaac v. Harvard University*, 769 F.2d 817, 818-19 (1st Cir.1985) (noting applicability of 300-day limit in Massachusetts due to existence of state law remedy for employment discrimination). The charge filed with the MCAD, however, was not timely, in that it came later than 180 days after the alleged discriminatory action. *See* Mass. G.L. c. 151B § 5.

Rule 15 of the Federal Rules of Civil Procedure provides that leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15. In considering a motion for leave to amend, however, the trial court must first consider whether the proposed new claims are futile, that is, whether they would be subject to dismissal for failure to state a claim. *Glassman v. Computervision Corp.*, 90 F.3d 617, 623 (1st Cir.1996); *Correa–Martinez v. Arrillaga–Belendez*, 903 F.2d 49, 59 (1st Cir.1990). If the claims are not futile, then the trial court must consider whether, given the timing of the motion for leave to amend, such prejudice to the defendant would arise from granting the motion that the motion should be denied on that ground. *See Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 139 (1st Cir.1985), *cert. denied*, 476 U.S. 1172, 106 S.Ct. 2896, 90 L.Ed.2d 983 (1986). The questions of futility

and prejudice are thus considered in turn in this memorandum.

### Analysis

#### A. *Futility*

#### 1. *The State Law Claim for Retaliation*

■ As noted above, the second charge filed by the plaintiff with the MCAD, alleging discriminatory termination, was not timely under Mass.G.L. c. 151B § 5. The defendant argues that the plaintiff's claim for retaliation is futile because that claim is barred by the plaintiff's failure to file a timely charge with the MCAD. The plaintiff argues that the filing of a separate charge was unnecessary, either because the Massachusetts courts would not require it under chapter 151B for a claim of retaliation, made under the circumstances presented here, or because this court can simply obtain jurisdiction over the claim by asserting "ancillary" jurisdiction.

The Massachusetts courts have not addressed whether a separate filing with the MCAD is required to give a court jurisdiction over a claim that an employer has taken adverse employment action against an employee in retaliation for her filing an earlier charge of discrimination. In interpreting the Massachusetts employment discrimination laws, however, Massachusetts courts often look to, although they are not bound to follow, interpretations by federal courts of similar federal laws. *See, e.g., College–Town v. MCAD,* 400 Mass. 156, 508 N.E.2d 587, 591 (1987) ("In interpreting our statute, we may look to the interpretations of Title VII of the analogous Federal statute."); *Massachusetts Electric Co. v. MCAD,* 375 Mass. 160, 375 N.E.2d 1192, 1198 (1978) ("While interpretations of a Federal Statute [Title VII] which is similar to the State statute [chapter 151B, § 4] under consideration are often helpful in setting forth all the various policy considerations, such interpretations are not binding on a State court construing its own statute."). Therefore, in attempting to determine how the Massachusetts courts would interpret chapter 151B, with respect to the question now before this court, the court first turns for guidance to interpretations by federal courts of Title VII, the federal analogue of chapter 151B, and then to a determination of the extent to which, if any, Massachusetts courts would follow those interpretations.

Federal law requires that an administrative charge be filed by a claimant before she may bring suit for employment discrimination. *See* 42 U.S.C. § 2000e–5(b). This requirement of Title VII has been analyzed under two slightly different standards, insofar as it relates to claims that have not been specifically presented to the EEOC, but which a plaintiff seeks to include in a civil action. The First Circuit holds that claims related to those brought before the EEOC, but not specifically raised there, may be made the subject of a civil suit if the claims can reasonably be said to have been within the scope of the EEOC's original investigation. This means, in the First Circuit's view, that the related claims must have been brought to the EEOC's attention while the EEOC was still able to investigate them. "A complaint related to that brought before the EEOC, but which was not itself made the subject of a separate EEOC complaint, must reasonably be expected to have been within the scope of the EEOC's investigation in order to meet the jurisdictional prerequisite. The retaliation claim here could not have been expected to be part of the scope of the EEOC's investigation growing out of appellant's earlier complaints, because plaintiff has not alleged that he even informed the EEOC of the alleged retaliation." *Johnson v. General Electric,* 840 F.2d 132, 139 (1st Cir.1988) (citation omitted).

The other circuits that have considered the question have applied a more lenient test in allowing retaliation claims to be added to lawsuits stemming from previously-filed EEOC complaints. See *McKenzie v. Illinois Dept. of Transp.,* 92 F.3d 473, 482 (7th Cir. 1996) for a discussion of the decisions of the various circuits on this question.

The Tenth Circuit has found justification for not requiring a separate charge to be filed with the EEOC, in situations like the one presented in this case, in the two-fold purpose of the requirement of exhaustion of administrative remedies itself. In *Ingels v. Thiokol Corp.,* 42 F.3d 616, 625 (10th Cir. 1994), the court noted that the two purposes

of the exhaustion requirement are: "1) to give notice of the alleged violation to the charged party; and 2) to give the EEOC an opportunity to conciliate the claim, which effectuates Title VII's goal of securing voluntary compliance." The court went on to point out, however, that "[i]n the retaliation context, notice has already been given and there is little likelihood that a second administrative complaint would lead to conciliation." *Id.* (citations omitted).

The Second Circuit has noted the risks of increased delay and expense that would accompany the requirement of a separate administrative filing. "[R]equiring a plaintiff to file a second EEOC charge under these circumstances could have the perverse result of promoting employer retaliation in order to impose further costs on plaintiffs and delay the filing of civil actions relating to the underlying acts of discrimination." *Butts v. City of New York Dept. of Housing*, 990 F.2d 1397, 1402 (2d Cir.1993).

The Fifth Circuit takes jurisdiction over retaliation claims without a second administrative filing by exercising "ancillary" jurisdiction. In *Gupta v. East Texas State University*, 654 F.2d 411 (5th Cir.1981), the Fifth Circuit held "that it is unnecessary for a plaintiff to exhaust administrative remedies prior to urging a retaliation claim growing out of an earlier charge; the district court has ancillary jurisdiction to hear such a claim when it grows out of an administrative charge that is properly before the court." *Id.* at 414. The court justified this holding on the practical reason that another administrative claim would simply be "a needless procedural barrier," *id.*, and on the policy consideration that the holding serves to "deter employers from attempting to discourage employees from exercising their rights under Title VII," *id.; see also Gottlieb v. Tulane University*, 809 F.2d 278, 284 (5th Cir.1987) (re-affirming *Gupta*).

The First Circuit has specifically left open the question of applying this "ancillary" jurisdiction approach. In *Johnson*, the First Circuit noted that "[w]e need not decide whether we would have 'ancillary' jurisdiction over the retaliation claim even in the absence of an EEOC complaint because with the dismissal of the remaining counts, there is no longer any federal court case to which the retaliation claim might be ancillary." *Johnson*, 840 F.2d at 139 n. 8 (citations omitted). Going through this open door, one court in this district has asserted "ancillary" jurisdiction over retaliation claims for which the administrative remedies were not exhausted. *See Borase v. M/A–Com, Inc.*, 906 F.Supp. 65, 69 (D.Mass.1995).

The difficulty arises in attempting to predict what action the Massachusetts Supreme Judicial Court ("SJC") would take in interpreting its state law, using federal court interpretations of similar federal laws for guidance. It is important to note in this connection, that, in interpreting Title VII, no circuit has held that the failure to file a subsequent administrative claim for retaliation absolutely precludes a plaintiff from bringing that claim to court. The First Circuit, while apparently limiting the direct route to court to those claims of which the administrative agency was aware at the time of its initial investigation, has nevertheless specifically left open the possibility of an indirect route, which would permit claims uncharged in the administrative proceeding to be asserted pursuant to the court's "ancillary" jurisdiction. When the Massachusetts courts have looked for guidance in interpreting state laws to federal interpretations of similar federal laws, they have not relied solely on First Circuit precedent. For example, in *Town of Burlington v. Labor Relations Comm.*, 17 Mass.App.Ct. 402, 459 N.E.2d 125, 127 (1984), the court relied on Second Circuit interpretations of the National Labor Relations Act in construing the Massachusetts Labor Relations Act. In *Howard v. Town of Burlington*, 399 Mass. 585, 506 N.E.2d 102, 105 (1987), the SJC relied on Ninth Circuit interpretations of the Federal Tort Claims Act in interpreting the Massachusetts Tort Claims Act. None of these cases, however, involved an issue of federal law on which the First Circuit had taken a view different from other circuits. Thus the question remains whether the SJC, in considering whether to require a separate administrative filing for a retaliation claim arising from an earlier filing, would follow

the relatively narrow approach of the First Circuit, the more generous approach of the other circuits that have considered the issue, or would decline to follow all the circuits and require in all circumstances, including circumstances like those presented here, a separate administrative filing.

■ Massachusetts courts are under a statutory mandate that chapter 151B "be construed liberally for the accomplishment of the purposes thereof." Mass. G.L. c. 151B § 9. The purpose of the administrative procedure, at both the state and federal levels, is to give the agency an opportunity to conciliate the claim and to avoid a civil suit. *See, e.g., Lattimore v. Polaroid Corp.,* 99 F.3d 456, 464 (1st Cir.1996). It is difficult to see how the MCAD can easily accomplish this goal in the retaliation context. When a plaintiff brings a civil action for retaliation—like the one here—in addition to her discrimination claim originally presented to the MCAD, it means perforce that the MCAD has not resolved the original claim; and that, moreover, the plaintiff now claims that the defendant has taken further wrongful actions in specific response to the original administrative complaint. To refuse to allow the prosecution of a retaliation claim in this context would be merely to exalt form over substance.

Furthermore, to require a separate administrative filing for retaliation claims, like the one presented here, would increase the cost to the plaintiff of prosecuting a claim. It would also likely delay final resolution of the original claim, as the plaintiff waits as each part of her claim clears the administrative hurdle, so that she can then bring one comprehensive lawsuit. If a plaintiff does not wait, and brings each claim as a separate suit, the result is a needless waste of judicial resources, because in each separate suit, the same original set of facts would have to be considered.

For all of these reasons, therefore, the court concludes that the SJC would eschew the First Circuit's narrow approach, and follow the more lenient approach of the majority of the federal circuits—those that find it

unnecessary for a plaintiff to exhaust administrative remedies before she can bring to court a retaliation claim not previously made known to the administrative agency, but arising out of a charge filed earlier with that agency.[1]

### 2. The Federal Claim for Retaliation

The plaintiff filed her retaliation claim with the EEOC within the required 300–day time limit. The defendant makes no argument as to timeliness as it relates to the filing of the claim with the EEOC. The defendant argues instead that to allow this proposed amendment so late in the game would be prejudicial to the defendant. The issue of prejudice from the timing of the proposed amendments, as it relates to all three claims, will be discussed later in this memorandum.

### 3. The Public Policy Exception to Terminating an At–Will Employee

Plaintiff's third new claim is a Massachusetts common law claim for wrongful discharge from employment in violation of public policy. She claims that she was discharged because she brought to the attention of Mitre, a government contractor, several instances of fraud and false statements by Mitre employees and management in connection with Mitre's spending of money derived from government contracts.

■ Under Massachusetts law, an at-will employee generally can be fired for any reason or for no reason at all. *See Folmsbee v. Tech Tool Grinding & Supply,* 417 Mass. 388, 630 N.E.2d 586, 590 (1994). Massachusetts recognizes a narrow exception to this rule. "We have recognized an exception to the traditional doctrine that at-will employees may be discharged for any reason or no reason at all, where the discharge is for reasons that violate public policy." *Flesner v. Technical Communications Corp.,* 410 Mass. 805, 575 N.E.2d 1107, 1110 (1991). The defendant argues that the general rule, not the exception, applies here, and the wrongful discharge claim is therefore futile because: (1) the plaintiff did not engage in a

---

**1.** Given this conclusion, the court need not reach the question of whether it would be appropriate, in this situation, to assert "ancillary" jurisdiction over the retaliation claim.

protected public policy activity; (2) the defendant did not know that the plaintiff was acting in furtherance of or pursuant to a public policy (indeed, says the defendant, it could not know, because the plaintiff was not, in fact, acting in furtherance of or pursuant to an established public policy); and (3) the termination of the plaintiff occurred too long after the plaintiff engaged in the alleged protected activity to permit any inference of retaliation.

a. *Public Policy*

■ Whether there is a public policy, sufficiently defined, that would preclude the discharge of an employee in violation of that policy is a question of law committed to the court. "It is not for the jury to define the public policy. The judge must determine whether, on the evidence, there is a basis for finding that a well-defined, important public policy has been violated." *Mello v. Stop & Shop Companies, Inc.*, 402 Mass. 555, 524 N.E.2d 105, 108 n. 7 (1988); *see also Smith–Pfeffer v. Fernald State School*, 404 Mass. 145, 533 N.E.2d 1368, 1372 (1989) ("the issue whether there was a public policy violation is a question of law for the judge").

■ There are some things that are clearly within the public policy exception. "Redress is available for employees who are terminated for asserting a legally guaranteed right (e.g., filing a workers' compensation claim), for doing what the law requires (e.g., serving on a jury), or for refusing to do that which the law forbids (e.g., committing perjury)." *Smith–Pfeffer*, 533 N.E.2d at 1371. Furthermore, an employee's assisting in a governmental investigation, even if he or she is not required to do so, falls within the public policy exception. *See Flesner*, 575 N.E.2d at 1111 ("Cooperating with an ongoing governmental investigation is an important public deed which fits this category.").

But the Supreme Judicial Court "consistently has interpreted the public policy exception narrowly, reasoning that to do otherwise would 'convert the general rule ... into a rule that requires just cause to terminate

an at-will employee.'" *King v. Driscoll*, 418 Mass. 576, 638 N.E.2d 488, 492 (1994) (quoting *Smith–Pfeffer*, 533 N.E.2d at 1371). In *Smith–Pfeffer*, the plaintiff asked the court to "extend the public policy exception to the at-will doctrine to cover discharges of employees without just cause if those employees are performing appropriate, socially desirable duties." 533 N.E.2d at 1371. The SJC responded that, "[t]he public policy exception to the at-will employment rule is not that broad." *Id.*

In determining whether a well-defined public policy exists, this court may look to legislative expressions of public policy.[2] "A basis for a common law rule of liability can easily be found when the Legislature has expressed a policy position concerning the rights of employees and an employer discharges an at-will employee in violation of that established policy." *Mello*, 524 N.E.2d at 106. Not all legislative enactments, however, rise to the level of important public policies. "While we often look to statutes to find pronouncements of public policy, it is not necessarily true that the existence of a statute relating to a particular matter is by itself a pronouncement of public policy that will protect, in every instance, an employee from termination." *King*, 638 N.E.2d at 493 (citations omitted). Hence, in *King*, the court refused to find that firing an employee for filing a shareholder's derivative suit—although state law gave him the right to file the suit—fell within the public policy exception. "This public policy, however, which relates to the financial well being of the corporation and, by extension, its shareholders, does not rise to the level of importance required to justify an exception to the general rule regarding termination of employees at will." *Id.*

■ The question this court must consider is the breadth of the public policy exception noted in *Flesner*, as it relates to actual or potential investigations of fraud and misuse of government funds. In this case, Smith claims she was terminated for insisting that

**2.** The common law may also serve as the source of public policy. *See King*, 638 N.E.2d at 493 (citing *Wright v. Shriners Hosp.*, 412 Mass. 469, 589 N.E.2d 1241, 1246 (1992) (Liacos, C.J., dissenting)).

Mitre, for whom she worked as an internal auditor, comply with federal law prohibiting fraud and the making of false claims in connection with the performance of federal government contracts. To put it another way, Smith claims that she was terminated because she was a potential "whistleblower."

In discussing actions taken by employees that are "important public deeds [deserving of protection], even though the law does not absolutely require the performance of such a deed," *Flesner,* 575 N.E.2d at 1111, the *Flesner* court notes that " '[w]histleblowing' . . . may fall into this category." *Id.* at 1111 n. 3; *see also GTE Products Corp. v. Stewart,* 421 Mass. 22, 653 N.E.2d 161, 165 (1995) ("It has been suggested that a 'whistleblower' might be entitled to protection on this basis."). From these cases and from the conclusion of the SJC in *Flesner* that cooperating with an ongoing governmental investigation is an activity worthy of protection by the public policy exception, *Flesner* 575 N.E.2d at 1111, the court concludes that, faced squarely with the issue, the SJC would accord protection for whistleblowers within the public policy exception to the general rule on terminating at-will employees.

■ Mitre first argues, as to Smith's eligibility for whistleblower protection that Smith never actually "blew the whistle" in that she never complained of the company's actions to anyone outside the company. The court has already determined, in another context, that the plaintiff did not bring to the attention of anyone outside of Mitre any alleged wrongdoing on Mitre's part. *See Smith v. Mitre Corp.,* C.A. No. 95–10724–RCL, slip op. at 2 (D.Mass. June 20, 1996). According to her complaint in this case, however, Smith did lodge internal complaints with Mitre concerning alleged false claims and possible fraud. *See, e.g.,* Complaint and Demand for Jury Trial, at ¶¶ 52, 62, 82.

A close reading of the SJC's decision in *Flesner* and the cases on which it relies leads this court to hold that Massachusetts would not require the employee to complain outside the organization to claim the public policy exception for whistleblowers in a case like this. That is, the court holds that the SJC would not require the plaintiff to have complained outside the organization as a predicate to protection, as a whistleblower, under the public policy exception, if she can establish that she complained internally about acts that allegedly constitute fraud and the making of false claims and then was terminated for her efforts.

In suggesting in *Flesner* the recognition of protection for whistleblowers under the public policy exception, the SJC relied on a number of cases from jurisdictions other than Massachusetts. An example particularly pertinent to the case now before this court is *Petrik v. Monarch Printing Corp.,* 111 Ill.App.3d 502, 67 Ill.Dec. 352, 444 N.E.2d 588 (1982). Petrik "alleged that in the course of performing his duties at [his company] he discovered a discrepancy in the corporation's financial records which he believed may have been due to criminal conduct; he investigated the source of the discrepancy and in an effort to force [the company] to comply with the Illinois Criminal Code he reported his suspicions to [the company's] management." *Id.* 67 Ill.Dec. at 356, 444 N.E.2d at 592. Despite the fact that Petrik never lodged a complaint with any outside authorities, the Illinois court held that he stated a claim for retaliatory discharge in violation of public policy. *Id.* Similarly, in *Brown v. Physicians Mut. Ins. Co.,* 679 S.W.2d 836 (Ky.App.1984), the Kentucky Court of Appeals found that a cause of action existed for termination in violation of public policy even though the plaintiff had not complained to outside authorities. *Id.* at 838 ("She reported her misgivings to her supervisor. Her attempts to contact the Insurance Commission were futile until she was fired."). *Cf.* Mass.G.L. c. 149 § 185 (Massachusetts whistleblower law applicable to public employers covers employee who "[d]iscloses, or threatens to disclose to *a supervisor* or to a public body") (emphasis added); *Marques v. Fitzgerald,* 99 F.3d 1, 6 (1st Cir.1996) ("We see no significant policy served by extending whistleblower protection only to those who carry a complaint beyond the institutional wall, denying it to the employee who seeks to improve operations from within the organization.") (interpreting Rhode Island law).

*Hutson v. Analytic Sciences Corp.*, 860 F.Supp. 6 (D.Mass.1994), also sheds light on this issue. In that case, the court, interpreting Massachusetts law, considered whether an employee of a defense contractor stated a claim for common law discharge in violation of public policy. Although the facts are not fully summarized, it appears that the plaintiff did not disclose his complaints to outside authorities. *See Hutson*, 860 F.Supp. at 11 (plaintiff alleged discharge "in retaliation for identifying, and to prevent him from disclosing, the alleged impropriety"). Despite this failure to complain outside of the organization, the court concluded that the plaintiff did state a cause of action under Massachusetts law.

■ Having decided that some whistleblowers, even if they have not complained to outside authorities, can qualify for the public policy exception, the court must now determine whether whistleblowing in this case, involving alleged fraud and false claims by a federal contractor, rises to such a level of social import so as to implicate the exception. *See King*, 638 N.E.2d at 493 ("Even a public policy, evidenced in a particular statute, which protects employees in some instances might not protect employees in all instances.").[3] The court concludes that blowing the whistle on fraud and false claims by a government contractor—even when that whistleblowing is confined within the company—is sufficiently important to command the invocation of the exception. Two cases in this district, construing Massachusetts law, are especially illuminating.

In *Tighe v. Career Systems Development Corp.*, 915 F.Supp. 476 (D.Mass.1996), Judge Gorton considered whether the federal Fraud and False Claims Act provided a sufficient public policy to invoke the exception. The judge initially concluded that an inability to bring a claim under the whistleblower provision of the statute did not prevent the use of the statute as a basis for public policy for the Massachusetts common law claim. *Id.* at 485.[4] Based upon 31 U.S.C. § 3730(h), the whistleblower anti-retaliation provision of the Fraud and False Claims Act, Judge Gorton concluded that "there exist federal statutes and regulations which clearly express a legislative policy encouraging persons such as [the plaintiff] to inform the [government] of possible contractual or statutory violations by their employers." *Id.*

The second case of particular significance is *Hutson v. Analytic Sciences Corp.*, 860 F.Supp. 6 (D.Mass.1994). That case involved an employee of a defense contractor who claimed he was terminated for internal complaints about problems in the company's compliance with terms of the contract. The court found an important public policy in statutes relating to fraud in defense contracts. "If the plaintiff was discharged in order to squelch further inquiry into, or disclosure of, purportedly fraudulent claims for payment, the Court is of the view that he had a claim for wrongful termination against public policy under Massachusetts law." *Id.* at 11. *Hutson* thus bears a striking similarity to the case at bar.

This court agrees with the analysis in *Tighe* and *Hutson* and concludes that the

3. The fact that Mitre is a non-profit corporation, funded mainly through government grants and hence taxpayers dollars, distinguishes the current situation from *King v. Driscoll*, 418 Mass. 576, 638 N.E.2d 488 (1994), in which the Supreme Judicial Court held that the exercise of the right to file a derivative suit did not amount to a sufficient public policy to implicate the exception to the at-will employment rule. *See King*, 638 N.E.2d at 493 (stressing tenuousness of link between internal, private corporation's conduct and effect on the public). Furthermore, the government contracts involved specifically subject Mitre to claims under the federal Fraud and False Claims Act. *See* 31 U.S.C. § 3729.

4. This court, in a previous ruling in this case, dismissed, on defendant's motion for summary

judgment, a claim brought under the whistleblower provision of the Fraud and False Claims Act, holding that the plaintiff had adduced no competent evidence to create a triable issue on the element of the claim that required that she had to have "engaged in protected activity in furtherance of a False Claims Act suit or a False Claims Act suit to be filed." *Smith v. Mitre*, No. 95–10724–RCL, slip op. at 2 (D.Mass. June 20, 1996). However, because the court has concluded here that an external complaint is not required to state a claim for termination in violation of public policy, *see supra*, the dismissal of the earlier claim does not mandate the futility of the amendment to the complaint now proposed.

SJC would hold that, as a matter of law, Smith's complaints to Mitre about alleged fraud and false claims involve a sufficiently important public policy such that she, in her proposed amendment, states a claim for termination in violation of public policy.

### b. *Mitre's Knowledge*

■ Mitre next argues that, because plaintiff Smith's original job was to conduct internal audits, it had no reason to know that she might be conducting the audits for any other reason, that is, any reason implicating public policy. Therefore, Mitre argues, Smith could not have been fired in retaliation for her investigation of fraud and false claims.

This argument can be swiftly dispatched.

In the first place, it appears from the original complaint that Smith's job was, in part, that of being company ombudsperson for complaints about misuse of government funds, and the company's compliance officer for the proper use of such funds. Complaint and Demand for Jury Trial at ¶¶ 40–44. Thus, it appears that Smith's performance of her job itself implicated public policy. That is to say, her job and public policy appear to have been inextricably bound together such that her work was itself in furtherance of public policy.

Furthermore, the original complaint here alleges that the plaintiff investigated and complained internally of alleged fraud and misuse of government funds at the highest levels of Mitre and that her internal complaints went unheeded. Complaint and Demand for Jury Trial, e.g., ¶¶ 45–47, 57–75. Instead of acting on her complaints, the plaintiff alleges, Mitre obstructed her work and commenced a campaign of adverse employment actions against her. Complaint and Demand for Jury Trial, *passim.* What Mitre knew, when it knew it, what was reasonable for Mitre to infer from all the circumstances, and the significance of all of this to a claim by Smith that she was terminated in retaliation for her internal complaints regarding alleged misuse of government funds are matters that should be deferred to later stages of this case. Indeed, at this point, at least, they appear to be issues for trial.

### c. *Inference of Retaliation*

■ Finally, Mitre argues that too long a period of time elapsed between Smith's internal complaints and her termination to permit an inference of retaliation. Smith responds, persuasively, that in this case, the retaliation claim is not based solely on an inference from the proximity in time between her actions and her termination. Instead, she alleges a number of adverse employment actions taken by Mitre between the time of her reports to Mitre of her findings as internal auditor and her termination, including her initial demotion, the refusal by her superiors to assign her sufficient work and false characterizations of her work performance by her superiors. Complaint and Demand for Jury Trial ¶¶ 180–184, 190–194, 195–198; Proposed Amended Complaint, ¶ 202c. These actions, Smith argues, demonstrate a continuum of negative responses to her complaints about alleged false and fraudulent claims and support an inference that her termination was retaliatory. Furthermore, the question of what inferences may reasonably be drawn from the facts is another matter that should be deferred to trial, or at least to later stages of this case.

### B. *Prejudice from Delay*

■ Under Fed.R.Civ.P. 15, leave to amend "shall be freely given when justice so requires." Mitre argues that allowing the new claims at this stage of the proceedings would delay the trial, and that this delay would, in itself, constitute sufficient prejudice to justify denying the motion to amend. "An addition of a new claim close to trial when discovery is essentially complete and trial strategy already planned invariably delays the resolution of a case, and delay itself may be considered prejudicial, especially where excessive delay has already occurred." *Andrews v. Bechtel Power Corp.,* 780 F.2d 124, 139 (1st Cir.1985), *cert. denied* 476 U.S. 1172, 106 S.Ct. 2896, 90 L.Ed.2d 983 (1986) (citing *Tiernan v. Blyth, Eastman, Dillon & Co.,* 719 F.2d 1 (1st Cir.1983)); *see also Logan Equipment Corp. v. Simon Aerials, Inc.,* 736 F.Supp. 1188, 1207 (D.Mass.1990) ("Where, as here, leave to amend would require post-

ponement of the action to allow further discovery, it may justifiably be denied."). In the end, however, the decision to grant leave to amend lies within the discretion of the court. *See Andrews,* 780 F.2d at 139 (reviewing delay question on motion to amend under abuse of discretion standard).

After careful consideration of all the arguments on the prejudice question, the court concludes, that, on balance, the prejudice argument is not persuasive. Although Mitre is correct that allowing this motion will delay trial and force a re-opening of discovery, other factors convince the court that the amendment should not be foreclosed on grounds of prejudice.

First, the wrongful termination claim the plaintiff now seeks to add to the complaint is similar, in substance, to the Fraud and False Claims Act claim dismissed by this court on June 20, 1996. It was just one month after the dismissal of this claim, July 22, 1996, that the motion to amend was filed. While the two claims are distinct, it is reasonable to conclude that the plaintiff determined them to be, generally, duplicative. Hence, no need to file this claim was apparent until the court dismissed the Fraud and False Claims Act claim. As for the federal retaliation claim, the EEOC did not issue the required right to sue letter until July 9, 1996. The motion to amend was filed just two weeks later.

Second, the statute of limitations on the new claims has not yet run. Therefore, if the motion for leave to amend is denied, the plaintiff may well file a separate lawsuit, and litigation between these two parties will continue. Because neither the separate wrongful termination claim nor the retaliation claim under chapter 151B states a federal question, and diversity jurisdiction appears to be lacking, the parties would find themselves in two lawsuits—one in this court and one in the state court—instead of in a single lawsuit in this court. Thus, judicial economy would appear to dictate that the plaintiff's motion for leave to amend the complaint be granted.

### Conclusion

For the foregoing reasons, the plaintiff's motion to amend complaint is GRANTED. The parties may conduct discovery on the matters raised by the amendment to the complaint up to and including February 28, 1997.

SO ORDERED.